Alexander E. GUERRERO, a minor child (D.O.B. 9–8–89) by his next friend and father, Cristian Guerrero; Cristian Guerrero and Juana Guerrero, individually, Appellants,

v.

ALASKA HOUSING FINANCE CORPORATION and State of Alaska, Department of Transportation and Public Facilities, Appellees.

No. S–8667.

Supreme Court of Alaska.

Aug. 4, 2000.

Phillip Paul Weidner, Weidner & Associates, Inc., and Michael Cohn, Anchorage, for Appellants.

Steven D. DeVries, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee Alaska Housing Finance Corporation.

William F. Morse, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee Department of Transportation and Public Facilities.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Alexander Guerrero was hit by a car while he crossed a busy street near a public housing complex where he and his family were living. His parents sued the Alaska Department of Transportation and Public Facilities, which built and maintained the street, and the Alaska Housing Finance Corporation, which owns and operates the housing complex, alleging negligent design, construction, maintenance, and failure to warn. The superior court dismissed the Guerreros' complaint for failing to state a viable claim, ruling that the department was entitled to discretionary function immunity and that the corporation owed no duty to protect Alexander from injury occurring off the housing complex premises. We reverse, finding the complaint legally sufficient on its face because it alleges the negligent performance of at least some potentially non-discretionary functions by both defendants under circumstances requiring them to exercise due care toward the plaintiffs.

## II. FACTS AND PROCEEDINGS

Five-year-old Alexander Guerrero was hit by a car and severely injured as he attempted to cross C Street near its intersection with 22nd Avenue in Anchorage. The section of C Street where the accident occurred is part of a traffic couplet on A and C Streets (the A/C Couplet) [1] that was built by the Alaska Department of Transportation and Public Facilities (the department). At the time of the accident, Alexander and his fami-

---

1. The A/C traffic couplet consists of two multi-lane, one-way streets—A Street and C Street—that run in opposite directions and are designed to channel rush-hour traffic smoothly into and out of the downtown Anchorage area.

ly lived at the Loussac Family Housing Complex (the Loussac Complex), a low-income housing project sponsored by the Alaska Housing Finance Corporation (the corporation), a public corporation within the Alaska Department of Revenue.[2] The Loussac Complex is directly adjacent to the accident scene, situated between A Street on the east, C Street on the west, 20th Avenue on the north, and 22nd Avenue on the south.

The Guerreros sued the department and the corporation, alleging negligence in the design, construction, and maintenance of the A/C Couplet and related pedestrian systems in the vicinity of C Street and 22nd Avenue as they relate to the occupants of the Loussac Complex. They also alleged that the corporation had a duty as a landlord to ensure that conditions on its property did not subject tenants to hazards on C Street.

The department and the corporation moved to dismiss under Alaska Civil Rule 12(b)(6). The department claimed discretionary function immunity under AS 09.50.250(1). The corporation argued, first, that its duty as a landlord did not extend beyond its property and, second, that it, too, was immune under the discretionary function statute.

The Guerreros moved for discovery, but the defendants opposed their efforts and moved to stay all discovery pending a decision on their motions to dismiss. The Guerreros then moved to have the superior court visit the accident scene. The court denied the Guerreros' motions, stayed discovery, and eventually granted the defendants' motions to dismiss, expressly refusing to consider information outside the pleadings.

In response to the dismissal, the Guerreros moved for reconsideration and for leave to file an amended complaint. The court denied reconsideration but allowed the Guerreros to amend their complaint. Their amended complaint elaborated on their initial claims, listing eleven ways in which the Guerreros

claimed that each defendant negligently breached its duty of care toward them.

After filing their amended complaint, the Guerreros again moved for discovery; the superior court denied their motion. In the meantime, the defendants had moved to dismiss the amended complaint. After hearing oral argument, the superior court granted the defendants' motions and dismissed the case under Alaska Civil Rule 12(b)(6), concluding that the amended complaint failed to state a claim upon which relief could be granted against the department or the corporation. The court ruled that the department was entitled to discretionary function immunity under AS 09.50.250(1) because "installing or not installing safety features in specific areas is precisely the type of decision the doctrine of sovereign immunity for discretionary acts is meant to protect." The court also ruled that the corporation had no duty to protect the Guerreros from traffic hazards, finding it "firmly established that the duty of safeguarding children against obvious dangers off a landlord's property does not fall on the landowner." The Guerreros appeal.

## III. DISCUSSION

### A. Standard of Review

Alaska Civil Rule 12(b)(6) allows early dismissal of a complaint for "failure to state a claim upon which relief can be granted." Invoking this provision, the superior court concluded as a matter of law that the Guerreros' amended complaint was insufficient on its face. The court declined to consider extrinsic materials offered by the Guerreros. We therefore confine our review to the face of the amended complaint.[3]

We review a Rule 12(b)(6) dismissal de novo,[4] deeming all facts in the complaint true and provable.[5] Because complaints must be liberally construed, a motion to dismiss under Rule 12(b)(6) is viewed with disfavor and should rarely be granted.[6] To sur-

---

2. See AS 18.56.020.

3. See Adkins v. Nabors Alaska Drilling, Inc., 609 P.2d 15, 21 & n. 11 (Alaska 1980).

4. See Kollodge v. State, 757 P.2d 1024, 1026 n. 4 (Alaska 1988).

5. See id.

6. See id. at 1026; see also Odom v. Fairbanks Mem'l Hosp., 999 P.2d 123, 128 (Alaska 2000).

vive, "the complaint need only allege a set of facts 'consistent with and appropriate to some enforceable cause of action.' " [7] Thus, "[a] complaint should not be dismissed for failure to state a claim *unless it appears beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [8]

### B. *It Does Not Appear Beyond Doubt that the Department and the Corporation Owe the Guerreros No Actionable Duty.*

■ This court ordinarily considers whether a duty exists before addressing immunity questions.[9] Whether an actionable duty of care exists "is essentially a public policy question" involving

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.[10]

#### 1. *The department's duty of care is not affected by Alexander Guerrero's potential misuse of C Street.*

■ Although the superior court evidently assumed that the department owed the Guerreros a duty of due care in the design, construction, and maintenance of the A/C Couplet, the department now claims that it owes no duty to "children whose guardians do not prevent them from running out into traffic." It analogizes this case to *Schumacher v. City and Borough of Yakutat*, in which we recently held that a city had no duty "to take specific steps to prevent sledding in its streets, or to ensure that its streets were safe for sledding." [11] Here, as in *Schumacher*, the department argues, a child decided to misuse the public street, and therefore no duty arose with respect to his conduct.[12]

But while the department suggests that Alexander Guerrero impermissibly "darted onto C Street" and was "jaywalking into the paths of oncoming traffic," it neglects to support these claims with facts or law. The amended complaint—the only source of facts relevant here—does not establish exactly how Alexander attempted to cross C Street; nor does it permit a conclusive inference that his conduct was illegal. The complaint does indicate that there was no crosswalk at C Street and 22nd Avenue. But the department cites no authority establishing that walking across C Street at or near this intersection without the benefit of a crosswalk necessarily would amount to "jaywalking" or otherwise violate state or municipal law.[13]

Moreover, *Schumacher* is inapposite. The misuse of streets addressed in *Schumacher* was the general activity of sledding on city streets; because there is no permissible way

**7.** *Odom*, 999 P.2d at 128 (quoting *Linck v. Barokas & Martin*, 667 P.2d 171, 173 (Alaska 1983)).

**8.** *Martin v. Mears*, 602 P.2d 421, 429 (Alaska 1979) (emphasis added) (quoting *Schaible v. Fairbanks Med. & Surgical Clinic, Inc.*, 531 P.2d 1252, 1257 (Alaska 1975)).

**9.** *See Kooly v. State*, 958 P.2d 1106, 1108–09 & n. 8 (Alaska 1998).

**10.** *Schumacher v. City & Borough of Yakutat*, 946 P.2d 1255, 1257 (Alaska 1997) (quoting *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981)).

**11.** 946 P.2d at 1257.

**12.** *See id.* at 1258 (noting that the road only became a danger to the plaintiff as a result of his

misuse of it and stating: "Whatever duty the City might have owed to [the plaintiff] regarding dangerous road conditions did not extend to dangers created by [the plaintiff's] own conduct.").

**13.** In fact, the department cited no state or municipal law at all on this point in its brief. Following oral argument, the department submitted a statement of supplemental authority citing several state and municipal traffic regulations that govern a pedestrian's right to cross public roadways. *See* 13 Alaska Administrative Code (AAC) 02.155(b)–13 AAC 02.160; 13 AAC 02.175(d); Anchorage Municipal Code (AMC) 09.20.020(B)-AMC 09.20.040. But none of these provisions definitively establishes that an illegal attempt to cross C Street occurred in the present case.

to sled on city streets, the activity itself was improper.[14] Thus, in referring to sledding as a misuse of the street, we did not suggest that the question of duty turned on the particular manner in which the sledding occurred. We later made this point clear in *Kooly v. State*, where we extended *Schumacher* by holding that the state had no general duty to protect sledders who use state rights-of-way.[15] Taking guidance from *Schumacher*, we emphasized that our duty analysis centered not on the particular facts at issue, but on the general activity of sledding on public rights-of-way:

> We do not limit our inquiry to the particular facts of this case. We take as well a generalized approach which asks whether a duty of care should be imposed in the general class of cases involving sledding and similar uses of public rights-of-way.[16]

Applying the same generalized approach to our duty analysis here, we must focus not on the particular facts of this case, but on the general activity of pedestrians using roadways. In contrast to sledding on streets, walking across intersections and public roadways is a common, generally permissible and, indeed, often necessary activity. The state does not deny that it generally owes a duty of due care to pedestrians who lawfully cross its roadways; it maintains only that this duty somehow vanished under the particular facts of this case because the crossing alleged in the complaint was unlawful. Yet just as the state's general duty of due care toward motorists does not hinge on a particular driver's misuse of the highways,[17] neither can its general duty toward pedestrians who cross

public roadways turn on the particularized facts of each case.

■ "[F]act-intensive inquiries pertain to the issues of breach, causation, and damages, not to the threshold legal question of whether a duty exists." [18] Thus, even if the amended complaint established beyond doubt that Alexander Guerrero "darted" onto the street, or "jaywalked," or otherwise violated city or state regulations by attempting to cross C Street, his conduct could not absolve the department of the duty it owed him; rather, his conduct would bear on the jury's determination of negligence, breach, causation, and damages.

2. *The complaint does not rule out the existence of an actionable duty by the corporation.*

The superior court concluded that the corporation had no duty to protect the Guerreros against obvious dangers existing off the Loussac Complex premises. On appeal, the Guerreros challenge this ruling, arguing that the corporation's duty of due care required it to take reasonable measures to protect tenants against hazardous conditions on the adjacent roadway.[19] In response to the Guerreros' argument, the corporation acknowledges that it owed its tenants a duty of due care, but it insists that this duty applied only within the boundaries of the Loussac Complex and did not extend to the roadway, which it neither owned nor controlled.

■ Alaska cases recognize that "[a]s a general rule, landowners have a duty to use due care to guard against unreasonable risks created by dangerous conditions existing on

---

14. *See* 946 P.2d at 1258.

15. *See* 958 P.2d 1106, 1108 (Alaska 1998).

16. *Id.* at 1108–09.

17. *See State v. Kaatz*, 572 P.2d 775, 779–80 (Alaska 1977).

18. *Bolieu v. Sisters of Providence in Wash.*, 953 P.2d 1233, 1241 (Alaska 1998).

19. The Guerreros also argue that, apart from its duty as a landlord, the corporation owes independent duties to its tenants under its statutory mandate as a public corporation. But the statutes that the Guerreros rely on—including AS

18.55.680, AS 18.55.690, AS 18.55.720, and AS 18.56.010—create no independent duties; at most, they give the corporation limited discretion to undertake responsibility for enhancing safety in areas surrounding its housing projects. If the corporation actually did undertake any enhanced responsibility in connection with the Loussac Complex or the A/C Couplet, its undertaking certainly might affect the scope of the corporation's duty to the Guerreros, and this, in turn, would be a relevant consideration in determining whether the Guerreros' complaint states a potentially viable cause of action. But the statutes themselves are not the source of any independent mandatory duty.

their property."[20] Many other jurisdictions apply the same general rule limiting liability to risks on a landowner's property, some more rigorously than others.[21] For example, courts traditionally have held that a landlord had no duty to erect a fence protecting tenants from off-site conditions.[22] But some courts now find a duty to repair and maintain an existing fence, holding the landlord liable if a negligent breach of this duty injures a tenant off the premises.[23] And some courts now hold that the lack of a fence or warning about off-site hazards can amount to "a dangerous condition on [the] property."[24] This is so even if the tenant is ultimately injured by a condition on property that the landlord neither owns nor directly controls.[25]

The corporation cites many cases involving circumstances comparable to those of the present case—a child leaves the landlord's property and is injured or killed by a force encountered off the property—in which courts have found no duty on the part of the landlord.[26] But there are other cases on point in which courts have held that the scope of the landlord's duty cannot be resolved as a matter of law simply because the landlord does not directly own or control the place where the injury occurred:

> A landowner's duty of care to avoid exposing others to a risk of injury is not limited to injuries that occur on premises owned or controlled by the landowner. Rather,

the duty of care encompasses a duty to avoid exposing persons to risks of injury that occur offsite if the landowner's property is maintained in such a manner as to expose persons to an unreasonable risk of injury offsite.[27]

Thus, cases in other states are divided: the traditional view—still the decided majority—weighs against imposing a duty to warn or otherwise protect tenants from dangers of traffic on adjacent streets over which the landlord has no right of possession, management, or control. But an emerging minority would impose a duty to protect or warn in some situations; these cases apply a standard of reasonable care under the totality of the circumstances that considers possession, management, and control over conditions at the accident site to be relevant factors but does not make their absence dispositive as a matter of law.

 This court has never categorically ruled that a landlord's duty cannot extend off-premises under certain circumstances. And we have not squarely addressed the issues of whether or when a landlord might have a duty to protect or warn tenants about dangers occurring on land adjacent to the landlord's premises. Nor do we find it necessary to resolve these issues here. Given that the Guerreros' case involves a summary dismissal under Rule 12(b)(6), we find that

---

20. *Schumacher v. City & Borough of Yakutat*, 946 P.2d 1255, 1258 (Alaska 1997) (footnote omitted); *see also Webb v. City & Borough of Sitka*, 561 P.2d 731, 733 (Alaska 1977), *superseded by statute on other grounds as stated in University of Alaska v. Shanti*, 835 P.2d 1225, 1228 (Alaska 1992).

21. *See, e.g., Roth v. Wu*, 199 Ga.App. 665, 405 S.E.2d 741, 742 (1991); *Rand v. Knapp Shoe Stores*, 178 Mich.App. 735, 444 N.W.2d 156, 157–58 (1989); *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 147 N.J. 510, 688 A.2d 1018, 1024 (1997); *Lauman v. Plakakis*, 84 N.C.App. 131, 351 S.E.2d 765, 766–67 (1987); *Scarborough v. Lewis*, 523 Pa. 30, 565 A.2d 122, 125–26 (1989); *Portillo v. Housing Auth. of the City of El Paso*, 652 S.W.2d 568, 569 (Tex.App.1983).

22. *See, e.g., McCarthy v. New York, New Haven & Hartford R.R. Co.*, 240 F. 602, 605 (2d Cir.1917).

23. *See Calkins v. Cox Estates*, 110 N.M. 59, 792 P.2d 36, 40–41 (1990); *Nelson ex rel. Stuckman*

v. *Salt Lake City*, 919 P.2d 568, 573–74 (Utah 1996).

24. *Alcaraz v. Vece*, 14 Cal.4th 1149, 60 Cal. Rptr.2d 448, 929 P.2d 1239, 1244 (1997).

25. *See Barnes v. Black*, 71 Cal.App.4th 1473, 1478, 84 Cal.Rptr.2d 634 (Cal.App.1999); *McDaniel v. Sunset Manor Co.*, 220 Cal.App.3d 1, 7–8, 269 Cal.Rptr. 196 (Cal.App.1990) (applying factors identical to those in *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981), to determine the scope of the duty of care whether the harm is situated onsite or offsite).

26. *See* cases cited *supra* note 21.

27. *Barnes*, 71 Cal.App.4th at 1478, 84 Cal. Rptr.2d 634; *see also Udy v. Calvary Corp.*, 162 Ariz. 7, 780 P.2d 1055, 1059 (App.1989); *Limberhand v. Big Ditch Co.*, 218 Mont. 132, 706 P.2d 491, 499–500 (1985).

two procedural points determine the duty issue.

First, the corporation acknowledges that it owes a general duty to protect its tenants from danger and "is in no different position than any other landlord on this issue." What the corporation disputes is only the scope of this duty—whether and when the duty extends to protecting against hazards occurring on an adjacent street. Second, our cases and case law in other jurisdictions do not clearly establish the scope of a landlord's duty in comparable settings.

In these circumstances, we take guidance from our recent decision in *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* where we made clear that our law usually regards questions concerning precisely how far a duty extends as distinct from questions concerning the duty's existence:

> Our precedents concern two sorts of questions of tort duty. In cases where no one disputes the existence of a duty running from one party to another, we have disfavored summary adjudication of the precise scope of that duty, or of whether particular conduct did or did not breach it (i.e., constitute negligence). This is particularly so when the scope of the duty poses a fact-specific question, involving policy and "circumstantial judgments" that our legal system reserves for the jury.
>
> On the other hand, summary judgment is proper where the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever— or owed a duty clearly and vastly narrower in scope than the one that the other party asserts in opposing summary judgment.[28]

In the present case, the allegations of the amended complaint, when taken as true and leniently construed (as they must be for purposes of reviewing a dismissal under Rule 12(b)(6)),[29] do not establish that the corporation's duty toward the Guerreros is "vastly narrower in scope"[30] than the one that the Guerreros assert. The Guerreros allege, among other things: that the corporation failed to provide safe access to or from the premises and no safe pedestrian access to either the bus stop at 22nd Avenue or the school located nearby on the west side of C Street; that it failed to post warning signs or provide any other warning of danger; that it built fencing obstructing access to a safe pedestrian underpass at 19th Avenue and C Street; and that it cut trees and built partial fencing around the perimeters of the Loussac Complex in a manner that funneled pedestrians in the opposite direction—toward the intersection at 22nd Avenue and C Street— an intersection that the corporation knew to be particularly dangerous.

The amended complaint also indicates that the Loussac Complex already existed when the department designed and built the A/C Couplet and that the complex is located within the core of the couplet. Given the corporation's status as a public corporation, its statutory mandate, and its authority to become involved in matters of tenant safety that potentially reach beyond the confines of its property,[31] the amended complaint fails to rule out the possibility that the corporation might have chosen to undertake off-site responsibilities: that it might have participated to some appreciable extent in the A/C Couplet planning process; that it might have influenced the project's design or plans; that it might have undertaken duties or retained a measure of influence or control over the adjoining roadway; or that it might have made commitments to modify the Loussac Complex, either to accommodate the A/C Couplet or to protect its tenants from the couplet's traffic hazards.

We imply no specific reason to believe that the corporation actually undertook any of these activities. But the allegations of the amended complaint do not rule them out. In other words, it does not "appear beyond

28. 956 P.2d 1199, 1203 (Alaska 1998) (footnote and internal citations omitted); *see also Dinsmore–Poff v. Alvord,* 972 P.2d 978, 987 (Alaska 1999) (summary judgment often improper when the question is whether the duty's precise scope encompassed a given situation).

29. *See Kollodge v. State,* 757 P.2d 1024, 1025–26 (Alaska 1988).

30. *Arctic Tug,* 956 P.2d at 1203.

31. *See supra* note 19.

doubt" that they did not occur.[32] It is therefore conceivable that the corporation extended its duty of care by affirmatively undertaking to protect Loussac Complex tenants from the A/C Couplet's hazards—an undertaking that might render it liable even under traditional views concerning the scope of a landlord's duties.

In sum, at this early procedural stage, we cannot exclude these possibilities. The corporation admittedly owes a duty of care to its tenants; it is not clear from the complaint that this duty is vastly narrower than the duty alleged by the Guerreros. Because the complaint does not rule out the existence of an actionable duty, dismissing against the corporation under Rule 12(b)(6) amounted to error.[33]

C. *It Does Not Appear Beyond Doubt that All of the Amended Complaint's Claims Against the Department and the Corporation Are Barred by Discretionary Function Immunity.*

In dismissing the Guerreros' amended complaint, the superior court determined as a matter of law that all its claims were necessarily barred by discretionary function immunity. On appeal, the Guerreros dispute this decision. Before reaching the merits of this dispute we must consider the threshold question of whether the corporation is a state agency capable of claiming immunity.

In one of this court's earliest cases, *Bridges v. Alaska Housing Authority,* we recognized the corporation's predecessor to be a corporate entity distinct from the State of Alaska.[34] In later decisions we confirmed the separate financial status of public corporate authorities, holding that the state generally is not responsible for their corporate liability.[35]

But whether the corporation remains a state agency for purposes of invoking immunity presents a separate question. As the corporation correctly argues, it is well settled that neither corporate status nor the power to sue and be sued as an independent entity wholly precludes an entity from being considered an arm of the state.[36] In *University of Alaska v. National Aircraft Leasing, Ltd.,* rejecting the traditional distinction between proprietary and government functions, we held that "the guideposts for . . . an inquiry [into a public entity's ability to claim immunity] are to be found more in political and functional realities than in organizational formalities."[37] Because we found that the university "acts for the benefit of the state and of the public generally in the process of government," we declared it to be an arm of the state for purposes of claiming immunity.[38]

In this regard, the corporation stands on the same footing as the university. As we indicated at the outset of this opinion, the Alaska Housing Finance Corporation is a public corporation organized within the Alaska Department of Revenue.[39] In creating the corporation, the legislature found that "[t]here . . . exist within the state remote,

32. *Martin v. Mears,* 602 P.2d 421, 429 (Alaska 1979).

33. We emphasize that our ruling on the impropriety of a dismissal under Rule 12(b)(6) does not necessarily preclude the superior court from deciding disputed issues of duty on summary judgment. Under *Arctic Tug,* a dismissal on summary judgment will be permissible if the record at that stage presents undisputed facts enabling the court to conclude as a matter of law that no reasonable juror could find that any duty toward the Loussac Complex tenants encompassed the duty alleged. *See* 956 P.2d at 1203. Our ruling on duty today holds only that the complaint, on its face, does not allow this conclusion.

34. *See* 349 P.2d 149, 152 (Alaska 1959) (holding that Alaska Housing Authority is not the state for purposes of eminent domain proceedings).

35. *See, e.g., Walker v. Alaska State Mortgage Ass'n,* 416 P.2d 245, 253 (Alaska 1966); *DeArmond v. Alaska State Dev. Corp.,* 376 P.2d 717, 722 (Alaska 1962).

36. *See University of Alaska v. National Aircraft Leasing, Ltd.,* 536 P.2d 121, 125 (Alaska 1975); *Alaska State Hous. Auth. v. Dixon,* 496 P.2d 649, 650 (Alaska 1972).

37. 536 P.2d at 125.

38. *Id.* at 128.

39. *See* AS 18.56.020.

underdeveloped, or blighted areas where the development of decent, safe, and sanitary housing is necessary to economic growth." [40] Finding these conditions "inimical to the safety, health, welfare, and prosperity of the residents of the state and to the sound growth of urban and rural communities," [41] the legislature empowered the corporation "to act on behalf of the state and its people in serving [these] public purpose[s] for the benefit of the general public." [42] Moreover, though it functions as an independent corporate entity, the corporation is represented by the state attorney general in legal matters,[43] and several state officials serve on its board, including the commissioners of revenue, community and regional affairs, and health and social services.[44] Finally, the legislature has provided that, upon termination, the corporation's rights and property pass to the state.[45]

These provisions convince us that the corporation "acts for the benefit of the state and of the public generally in the process of government" [46] and is therefore an instrumentality of the state for purposes of claiming sovereign immunity.[47] We thus proceed to the core immunity issue: whether the amended complaint potentially advances any claim against the corporation or the department not barred by discretionary function immunity.

▮▮▮ A complaint can be dismissed under Rule 12(b)(6) if an affirmative defense of statutory immunity clearly appears on its face.[48] The question here is whether the Guerreros' claims necessarily fall within AS 09.50.250(1)'s grant of discretionary function immunity. This form of immunity arises under AS 09.50.250 as an exception to .the state's general waiver of sovereign immunity from liability for tort damages:

> A person or corporation having a ... tort claim against the state may bring an action against the state.... However, an action may not be brought under this section if the claim
>
> (1) is an action for tort ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused[.]

In *State v. Abbott*, we adopted the "planning/operational" approach for identifying governmental acts that fall within this statutory exception.[49] More recently, in *State, Department of Transportation and Public Facilities v. Sanders*, we described this approach as follows:

> [W]e identify "discretionary" acts or functions by examining whether the act or function can be described as "planning" or "operational." A planning decision is one that involves policy formulation. In contrast, an operational decision involves policy execution or implementation. Only acts or functions occurring at the planning level are entitled to immunity as discretionary functions under AS 09.50.250.
>
> Under the planning/operational test, "liability is the rule, immunity the exception." The test focuses on the policy behind the discretionary immunity doctrine for guidance in determining whether a given act should receive immunity. "The policy underlying immunity is the necessity for 'judicial abstention in certain policy-making areas that have been committed to other

40. AS 18.56.010(a).

41. *Id.*

42. AS 18.56.010(c).

43. *See* AS 18.56.055.

44. *See* AS 18.56.030. The board must send a certified copy of the minutes of each meeting to the governor and to the Legislative Budget and Audit Committee. *See* AS 18.56.045.

45. *See* AS 18.56.020.

46. *University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121, 127 (Alaska 1975).

47. *Cf. Alaska Hous. Fin. Corp. v. Salvucci*, 950 P.2d 1116, 1122–26 (Alaska 1997) (treating the housing corporation as a state entity against which punitive damages could not be awarded).

48. *See J & L Diversified Enters., Inc. v. Municipality of Anchorage*, 736 P.2d 349, 351 (Alaska 1987).

49. 498 P.2d 712, 721 (Alaska 1972).

branches of government.' " "This policy in turn is based upon notions of separation of powers, and limitations on this court's ability to reexamine the questioned decision and the considerations that entered into it."[50]

We also have held that when a plaintiff bases a negligence claim on conduct that typically involves planning and policy, the plaintiff bears the burden of proving operational conduct:

[O]nce it is determined that the decision at issue is of the type entrusted to the planning level of government, a claimant must show that an affirmative assumption of duty has been made by the state in order to have a claim for relief for alleged operational negligence in performing that duty.[51]

In the present case, the superior court based its immunity ruling on *Jennings v. State*.[52] In urging us to affirm, the corporation and the department argue that the facts of *Jennings* are "remarkably similar" and "nearly identical" to the facts of this case and that *Jennings* therefore "compels ... dismissal." But the defendants fail to recognize that the Guerreros have had no opportunity to present evidence establishing the specific facts of their case; at present, they have merely filed a complaint advancing their basic allegations. By contrast, in *Jennings* we upheld an order of dismissal issued on summary judgment, and we based our ruling on an extensive factual record.

*Jennings* involved a seven-year-old girl, Janet Lewis, who was killed on her way home from school while attempting to cross College Road,[53] a four-lane highway in a suburban section of Fairbanks.[54] A driver

had stopped and motioned for her to cross, but another driver failed to stop.[55] The fatal accident occurred at a point almost three blocks away from the College Road intersection closest to Lewis's school—the intersection of Joy Street and College Road. There, the state had placed a cross-walk and traffic light.[56] The complaint in *Jennings* alleged that the state had negligently failed to build an overpass at Joy Street and College Road, to designate the intersection a school zone, and to provide additional controlled crossings on College Road.[57]

We concluded that all these allegations fell within the ambit of discretionary function immunity.[58] But we unequivocally stated that our resolution turned on the specific facts in the record: "In order to understand the allegations of negligence asserted against the State of Alaska, it is necessary that the location of the scene of the accident in relation to the situs of Joy School be delineated."[59] We expressly found "controlling significance" in the distance between the accident scene and the school crossing at College Road and Joy Street.[60] We further noted that state regulations made designation of school zones mandatory only in areas immediately adjacent to schools, specifically leaving government officials discretion in non-adjacent areas like the intersection of Joy Street and College Road.[61] Similarly, we pointed out that all posted speed limits on College Road complied with applicable regulations.[62]

*Jennings* further underscored the significance of the factual record by finding that the trial court had committed error in basing its order of dismissal solely on the pleadings:

50. 944 P.2d 453, 456–57 (Alaska 1997) (internal citations omitted).

51. *Industrial Indem. Co. v. State*, 669 P.2d 561, 566 (Alaska 1983) (footnote omitted); *see also Sanders*, 944 P.2d at 458 n. 5.

52. 566 P.2d 1304 (Alaska 1977).

53. *See id.* at 1307–08.

54. *See id.* at 1305.

55. *See id.*

56. *See id.* at 1307, 1312.

57. *See id.* at 1305, 1311.

58. *See id.* at 1311–12.

59. *Id.* at 1307.

60. *Id.* at 1312.

61. *See id.* at 1311 n. 28.

62. *See id.*

Even though the parties did little to call the superior court's attention to other items, including the three depositions on file, *the superior court should have gone outside the pleadings to consider the entire setting of the case to the extent that the material was brought to the court's attention by the parties* .... [63]

Thus, our decision in *Jennings* neither commands nor warrants the outright dismissal of all facially similar complaints. Instead, *Jennings* stands for the more modest proposition that summary judgment will be appropriate when a plaintiff who has been given an opportunity to develop and present evidence fails to produce any facts indicating operational negligence.[64]

*Jennings*'s reliance on case-specific evidence typifies our case law dealing with the discretionary function exception. We have placed certain kinds of government actions on the operational side of the operation-al/planning balance: highway maintenance,[65] painting lane markings on highways,[66] posting highway signage,[67] operating a seaplane dock,[68] and designing an airport runway for oversized aircraft.[69] We have characterized other actions as involving immune planning decisions: designating school zones,[70] installing traffic control signals,[71] installing highway guardrails,[72] reducing the speed limit during a period of highway construction,[73] failing to implement highway dust control measures,[74] failing to close an icy stretch of highway,[75] and failing to adequately staff a fire department.[76] Yet our decisions identifying discretionary functions have invariably involved cases decided on summary judgment; we have never affirmed a dismissal based on the pleadings alone.[77]

Furthermore, we have consistently indicated that what qualifies as a matter of basic planning or policy often depends more on the factual circumstances surrounding an agen-

63. *See id.* at 1310 (emphasis added). Yet another indication of *Jennings*'s fact-specific focus can be seen in its treatment of a separate claim of error: the plaintiff's claim that the trial court abused its discretion in ruling on the state's motion for summary judgment without first requiring the state to comply with an outstanding request for discovery. Although we upheld the trial court's refusal to postpone ruling on the immunity issue pending additional discovery, we specifically based our decision on the plaintiff's failure to file a proper request for additional time, as required by Alaska Civil Rule 56(f). *See id.* at 1313–14. In affirming on this narrow ground, we tacitly recognized that the plaintiff would have been entitled to additional discovery if she had filed a proper request. *See id.*

64. We implicitly made this point in *Jennings* by distinguishing prior immunity decisions on the ground that they involved situations in which the evidence established that the state had affirmatively undertaken a discretionary duty:

Similarly, in the case at bar, had the planning level decision been made to delineate this area a school zone and then the state negligently signed the area or negligently constructed a crosswalk, a cause of action might have arisen against the state for these negligently performed operational level acts.

*Jennings*, 566 P.2d at 1312 n. 30.

65. *See State v. Abbott*, 498 P.2d 712 (Alaska 1972).

66. *See State v. I'Anson*, 529 P.2d 188 (Alaska 1974).

67. *See Jennings*, 566 P.2d at 1313.

68. *See Plancich v. State*, 693 P.2d 855 (Alaska 1985).

69. *See Japan Air Lines Co. v. State*, 628 P.2d 934 (Alaska 1981).

70. *See Jennings*, 566 P.2d at 1311.

71. *See Rapp v. State*, 648 P.2d 110 (Alaska 1982); *Wainscott v. State*, 642 P.2d 1355 (Alaska 1982).

72. *See Industrial Indem. Co. v. State*, 669 P.2d 561 (Alaska 1983).

73. *See Earth Movers of Fairbanks, Inc. v. State*, 691 P.2d 281 (Alaska 1984).

74. *See Freeman v. State*, 705 P.2d 918 (Alaska 1985).

75. *See Estate of Arrowwood ex rel. Loeb v. State*, 894 P.2d 642 (Alaska 1995).

76. *See Adams v. City of Tenakee Springs*, 963 P.2d 1047 (Alaska 1998).

77. The state cites *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 152 (Alaska 1987), and *J & L Diversified Enters., Inc. v. Municipality of Anchorage*, 736 P.2d 349 (Alaska 1987), as immunity cases decided by Rule 12(b)(6) dismissals. Neither case is apposite: *Aspen* deals with qualified official immunity and *J & L Diversified* involves municipal immunity under AS 09.65.070 from suits arising out of the permitting process.

cy's actions than it does on the actions' inherent nature. Thus, in our earliest discretionary function decision, *Abbott*, we pointed out that by deciding to act on a policy matter, an agency can transform it into a straightforward act of implementation: "Once the initial policy determination is made ... decisions as to how that decision should be carried out ... [are] made at the operational level[.]" [78]

We recently echoed this point in *Sanders*, holding that, although airport officials were immune from liability for a discretionary decision to allow certain vehicles to use a public airport road, they owed the plaintiff an actionable duty once the decision was made: "[I]f those officials did not take reasonable steps to implement the planning decision in a non-negligent manner, the State may be liable." [79] We further emphasized that a matter of planning and policy can turn into an operational matter not only through agency action, but also through agency policies, regulations mandating agency action, or legal requirements limiting agency discretion. [80]

The department nevertheless insists that "a Rule 12(b)(6) motion is a procedural vehicle with characteristics which dovetail perfectly with the substantive law and policies of immunity." Asserting that the fundamental purpose of immunity is not merely to provide a defense to liability but to protect the state from being sued, the department contends that policy strongly favors summary dismissal when a plaintiff fails to meet the burden of clearly alleging operational negligence on the face of the complaint.

But the department mistakenly bases its policy argument on cases applying qualified official immunity—a distinct form of protection designed to shield public officials from being personally sued for good-faith official actions. [81] In contrast, discretionary function immunity operates as a limited exception to the state's broad waiver of sovereign immunity from tort liability [82]—a waiver that evinces the state's general willingness to face suit in tort cases. The law in this area correspondingly recognizes that "liability is the rule, immunity the exception." [83] And the underlying policies of the discretionary function exception—judicial abstention from policymaking, separation of powers, and limited judicial competence to review executive-branch policy decisions [84]—have little to do with sparing the state from being distracted by litigation.

Moreover, the department's argument favoring summary dismissal raises serious practical concerns. Because the duty to take operational actions in matters that ordinarily involve planning or policy may depend on an agency's affirmative choices, its internal policies, or legal requirements that may not be commonly known, a plaintiff filing suit may lack sufficient information to plead specific facts showing that the agency has affirmatively undertaken an operational duty or that the duty is imposed by policy or regulation. Because our cases require the plaintiff to bear the burden of proving negligence based on operational acts, [85] the prospect of summary dismissal confronts the plaintiff with a dilemma: if the complaint is subject to summary dismissal for failure to clearly show operational negligence, there will never be an opportunity to meet the burden.

█ A comparable dilemma confronts the court when it considers a Rule 12(b)(6) motion to dismiss on the ground of immunity. The rule allows dismissal only if it "appears

---

**78.** 498 P.2d 712, 722 (Alaska 1972).

**79.** 944 P.2d 453, 459 (Alaska 1997) (footnote omitted).

**80.** *See id.* at 457 (quoting and citing *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)).

**81.** Thus, in support of its argument, the department relies primarily on *Harlow v. Fitzgerald*, 457 U.S. 800, 816–17, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Karen L. v. State, Dep't of Health & Human Servs., Div. of Family &*

*Youth Servs.*, 953 P.2d 871, 879 (Alaska 1998)—both of which involve qualified official immunity.

**82.** *See* AS 09.50.250.

**83.** *Johnson v. State*, 636 P.2d 47, 64 (Alaska 1981).

**84.** *See Sanders*, 944 P.2d at 456–57.

**85.** *See Industrial Indem. Co. v. State*, 669 P.2d 561, 566 & n. 11 (Alaska 1983); *see also Sanders*, 944 P.2d at 458 n. 5.

beyond doubt" from the complaint that the state has a valid immunity defense.[86] But when a complaint may reflect unavoidable ignorance of agency actions and policies, the court can never know beyond doubt whether allegations that appear to implicate planning and policy mask agency actions that actually took place at the operational level. When a court faces this kind of uncertainty, dismissal would be improper until the summary judgment stage, after the plaintiff received access to discovery of relevant agency information.

Judged by these standards, the Guerreros' amended complaint is legally sufficient. In summary, the amended complaint alleges, among other things:

- that the department failed to provide any safe way of crossing between the Loussac Complex and a nearby school on the west side of C Street;
- that the department failed to post adequate signage, including the lack of signs warning pedestrians of the hazards of crossing C Street in the vicinity of 22nd and the lack of signs warning motorists of the potential presence of children;
- that the department unsafely designed and constructed the A/C Couplet project, in violation of its own design regulations, recommendations, and requirements; and that it took actions to change C Street and related rights-of-way in violation of design recommendations, regulations, and other applicable criteria;
- that the corporation was aware of these problems and failed to warn tenants or take curative action;
- that the department negligently placed, signed, maintained, and constructed a bus stop on the west side of C Street at 22nd Avenue and that it failed to provide a crosswalk;

- that both defendants created hazardous conditions by taking actions—including cutting down trees and building fencing—that funneled Loussac Complex residents away from the 19th Avenue underpass and into two unsafe C Street crossings, and that they failed to warn motorists of the pedestrian crossings, to provide crosswalks, or to otherwise remedy the dangerous conditions;
- that the corporation failed to sign or otherwise warn tenants of the danger on C Street;
- that the corporation defectively fenced the Loussac Complex playground and placed fences that impeded access from the complex to the 19th Avenue underpass and that funneled tenants toward the unsafe 22nd Avenue crossing; and
- that the corporation failed to provide tenants safe egress from and access to the Loussac Complex.

Many of these allegations describe apparent planning decisions. But the absence of an evidentiary record precludes us from eliminating all reasonable possibility that the Guerreros, if given the opportunity, might be able to discover and produce evidence of regulations, policies, or decisions by which the defendants became bound to take specific, operational actions to ensure public safety in connection with the design, construction, and maintenance of the A/C Couplet and the Loussac Complex.[87]

To a limited extent the amended complaint already alleges an affirmative undertaking of duties. For instance, it alleges that the department committed itself to take operational actions by affirmatively undertaking to design, build, and maintain the A/C traffic couplet. If these allegations are true, the department was required to implement its policy decisions in a non-negligent man-

**86.** *Martin v. Mears*, 602 P.2d 421, 429 (Alaska 1979) (quoting *Schaible v. Fairbanks Med. & Surgical Clinic, Inc.*, 531 P.2d 1252, 1257 (Alaska 1975)).

**87.** We recognize that most of the amended complaint's claims appear to describe exempt planning decisions, and we are not insensitive to the defendants' understandable concern that allowing this case to proceed will expose them to costly, time consuming, and unnecessary discovery that might merely confirm what now seems likely: that the defendants either owe no actionable duty to the Guerreros or are immune from liability. We emphasize that nothing in this decision precludes the defendants from requesting, or the superior court from imposing, reasonable restrictions on discovery or a graduated discovery schedule aimed at initially developing a record that might allow meaningful consideration of immunity and duty on summary judgment.

ner.[88] Thus, the pleadings alone do not "appear beyond doubt" to eliminate the possibility of operational negligence.

Finally, we note that the amended complaint includes at least one allegation against each defendant that appears to involve a non-exempt, operational act—for example, the corporation's alleged construction of a fence blocking access to the 19th Avenue underpass and the department's alleged failure to post adequate signage. Because Rule 12(b)(6) allows a complaint to survive if it alleges even a single "set of facts 'consistent with and appropriate to some enforceable cause of action,'"[89] these allegations alone would preclude dismissal.

## IV. CONCLUSION

For the foregoing reasons, we conclude that dismissal under Rule 12(b)(6) was error. We therefore REVERSE the judgment of dismissal and REMAND for further proceedings.

---

88. *See Sanders,* 944 P.2d at 459. We do not suggest that an agency's affirmative decision to undertake a discretionary duty necessarily renders all of its ensuing actions operational. To the contrary, when an agency makes a broad policy decision or undertakes a basic discretionary duty, its decision may lead to a broad and complex mix of secondary actions and choices, some purely operational but others requiring further planning and the formulation of new or additional policy. We recognize that the agency may then remain exempt from liability for secondary decisions that truly involve basic planning and policy. But here, as in *Sanders,* we advance a narrower point: once an agency has initially decided to undertake a discretionary duty, it can no longer claim its original discretion not to undertake that duty as the source of immunity for all of its downstream conduct.

89. *Odom v. Fairbanks Memorial Hospital,* 999 P.2d 123, 128 (Alaska 2000) (quoting *Linck v. Barokas & Martin,* 667 P.2d 171, 173 (Alaska 1983)).