Johnny L. **ANGNABOOGUK,** Phyllis **Backhaus, Alvin O. Bramstedt, James and Marilyn Garrison, Garr and Joanne Graham, April A. Halliday–Sandahl, John E. Hodge, Donald E. and Romola A. Loesche, William E. and Lucille Magee, Sr., Curtis and Lorri Patterson, and Alice White, Appellants,**

v.

**STATE of Alaska, Department of Natural Resources, Division of Forestry, Appellee.**

No. S–9439.

Supreme Court of Alaska.

July 13, 2001.

Peter Gruenstein and Daniel Hickey, Gruenstein & Hickey, Anchorage, and John H. Hinderaker and Gerald M. Nolting, Faegre & Benson, LLP, Minneapolis, MN, for Appellants.

William F. Morse, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

In June 1996 the Miller's Reach Fire burned over 37,000 acres in the Matanuska–Susitna Valley. The State, Department of Natural Resources, Division of Forestry responded to the initial fire and took control of firefighting operations from the local fire departments present at the scene. A group of plaintiff landowners who suffered damage to their homes and property brought suit, claiming that the State's firefighting activities were negligently conducted. The plaintiffs' claims were dismissed by the superior court below on the basis of discretionary function immunity under AS 09.50.250, and

1. *See Caudle v. Mendel,* 994 P.2d 372, 374 (Alaska 1999).

attorney's fees were awarded to the State. The plaintiffs have appealed these decisions. Because we conclude that the plaintiffs have alleged a set of facts that is consistent with an enforceable cause of action, and that the State is not immune as a matter of law under AS 09.50.250, we reverse the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

Because this is an appeal from an Alaska Civil Rule 12(b) dismissal, we will assume that the plaintiffs' factual allegations are true.[1]

This appeal concerns the Miller's Reach Fire that burned from June 2 through June 15, 1996 in the Matanuska–Susitna Valley. This fire burned over 37,000 acres and destroyed more than 500 homes.

On June 2, 1996, the initial fire began near a residential development in Houston, Alaska. Local volunteer fire departments from Houston, Big Lake, Willow, and Meadow Lake responded to the fire and fought the fire during the evening of June 2. During the evening of June 2 the local fire departments successfully brought the fire under control.

The State, Department of Natural Resources, Division of Forestry (Forestry) also responded to the fire on the evening of June 2, and assumed control of the fire suppression effort. Even though the fire was not completely extinguished, during the night of June 2 Forestry sent the local fire departments and most of their equipment back to their stations. Forestry conducted no firefighting activities during the night of June 2.

On the morning of June 3 the local fire departments returned to the scene, but were again sent away by Forestry's incident commander on the scene. The forces sent away by Forestry represented the majority of the resources available to fight the fire. The local fire departments had firefighting equipment at the scene including a fire engine that was capable of putting 1,000 gallons of water per minute on the fire. However, Forestry had only portable pumps with much smaller capacity.

Forestry's incident commander and the remaining forces under his control spent the morning of June 3 removing hoses that had been placed around the perimeter of the fire by the local fire departments. These forces then replaced these hoses with Forestry's own hoses. During the morning of June 3 Forestry personnel did not put any water on the fire and did not construct any sort of mineral-soil firewall to keep the fire from spreading.

On the afternoon of June 3 Forestry employees started one or more burnouts—fires set deliberately to dispose of unburned fuel that could assist the spread of the fire—near the perimeter of the fire. At this time Forestry did not have adequate resources available to suppress one of these burnouts if one were to burn out of control.

One of the burnouts did burn out of control in the afternoon and evening of June 3. The Forestry employee who started the out-of-control burnout sought help from other Forestry employees, and these personnel attempted to extinguish the burnout. However, at approximately 6:00 p.m. on June 3 the incident commander ordered all personnel on the scene to stop their firefighting activities and vacate the perimeter of the fire, and to gather at the Little Susitna River for dinner. The Forestry employees who had been dealing with the out-of-control burnout vacated the scene of the fire along with all other personnel at the scene. No lookouts or other personnel were posted on the perimeter of the fire at this time.

While the firefighting personnel were eating dinner at the Little Susitna River, shortly after 6:00 p.m., a column of smoke from the out-of-control burnout rose and was clearly visible to hundreds of people including Forestry's incident commander. At this time, some of Forestry's personnel, federal "smoke jumpers," also observed the column of smoke and radioed the incident commander to ask if any action should be taken. The incident commander told them not to worry about it, claiming (incorrectly) that the fire was not a problem because it was within the perimeter of the fire area.[2] The incident commander did not check the location of the fire and did not actually know where it was.

The federal smoke jumpers who spoke with the incident commander disregarded the incident commander's instructions and investigated the column of smoke. The smoke jumpers found the out-of-control burnout and attempted to extinguish it. Other personnel were summoned to the area to help with these efforts. Attempts to extinguish the burnout were hampered because the local fire departments' hoses and fire engine were no longer available, and because Forestry employees had turned off the Forestry pumps during the 6:00 p.m. dinner. After reactivating the pumps, Forestry personnel continued their attempts to extinguish the burnout, but before they could do so, the burnout "spotted"[3] and started a second fire, which the firefighting personnel on the scene were unable to reach. This second fire crossed Miller's Reach Road and became the "Miller's Reach Fire" that consumed 37,000 acres.

Two suits were brought in superior court by different groups of landowner plaintiffs against Forestry: the case at bar, before Superior Court Judge John Reese, and *Bartek v. State of Alaska, Department of Natural Resources,* before Superior Court Judge Beverly Cutler.[4] On July 20, 1999, Forestry moved to dismiss the complaint in this case, under three different theories: that the action was barred by the statute of limitations; that the State lacked a duty of care; and that the State was immune under the Alaska Tort Claims Act, AS 09.50.250. Judge Reese dismissed the case on immunity grounds without mentioning the other two theories. In doing so, Judge Reese adopted the oral ruling of Judge Cutler, who had earlier dis-

2. Some Forestry employees also inquired about the column of smoke with another Forestry crew boss, and this crew boss, like the incident commander, also failed to investigate the column of smoke.

3. "Spotting" refers to the phenomenon in which burning ashes and cinders are injected into the air. The fire "spots" when these ashes and cinders start another fire outside the existing fire perimeter.

4. No. 3PA–98–247 CI.

missed the *Bartek* action on the same grounds.[5]

After the dismissal, the superior court granted attorney's fees to Forestry under Civil Rule 68.

The plaintiffs have appealed the dismissal and the award of attorney's fees.

### III. *STANDARD OF REVIEW*

■ This appeal requires us to review the superior court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. We will review this dismissal de novo, assuming the truth of all facts alleged in the complaint.[6] We have explained that "[b]ecause complaints must be liberally construed, a motion to dismiss under Rule 12(b)(6) is viewed with disfavor and should rarely be granted."[7] A complaint need only allege a set of facts "consistent with and appropriate to some enforceable cause of action."[8] Therefore, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.[9]

### IV. *DISCUSSION*

The superior court dismissed the plaintiffs' claims based on Forestry's discretionary function immunity under AS 09.50.250. However, in this appeal Forestry also claims that dismissal is proper because Forestry owed the plaintiffs no actionable duty of care. Even though the court below did not rule on the existence of a duty of care, we have stated that "[d]etermining whether a duty exists in [a case alleging negligence by the State] is the first analytical step in deciding whether a negligence action can be maintained."[10]

■ Therefore, the dismissal below could be affirmed on one of two grounds:[11] (1) Forestry owed no actionable duty of care to the plaintiffs, or (2) Forestry was immune from suit under AS 09.50.250. We conclude that neither of these grounds supports dismissal.

#### A. *Forestry Owed the Plaintiffs an Actionable Duty of Care.*

■ A duty of care may arise either from statutory sources or from public policy.[12]

##### 1. *Forestry did not have a statutory duty of care.*

Three possible sources for a statutory duty of care are mentioned by the parties, and each of these will be discussed in turn: (1) AS 41.15.110(a); (2) 11 Alaska Administrative Code (AAC) 95.400–.495; and (3) Forestry's internal rules and guidelines.

###### a. *Alaska Statute 41.15.110(a) does not create a duty of care.*

■ The plaintiffs claim that Forestry owed the plaintiffs a statutory duty of care to fight the fire non-negligently under AS 41.15.110(a). That statute provides:

*Uncontrolled spread of fire; leaving fire unattended.* (a) A person who knows of a fire or sets a fire on forested land owned, possessed, or controlled by the person, shall exercise due care to prevent the uncontrolled spread of the fire. A person failing to exercise due care which results in spread of the fire and damage to property of another is guilty of a misdemeanor.

5. *Bartek v. State*, No. 3PA–98–247 CI (Alaska Super., February 9, 1999).

6. *See Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 253 (Alaska 2000).

7. *Id.*

8. *Linck v. Barokas & Martin*, 667 P.2d 171, 173 (Alaska 1983).

9. *See Guerrero*, 6 P.3d at 254.

10. *Kooly v. State*, 958 P.2d 1106, 1108 (Alaska 1998); *see also Stephens v. State, Dep't of Reve-* nue, 746 P.2d 908, 910 (Alaska 1987) ("Before we determine whether a statutory immunity applies to a given case, we will determine whether the State would be liable to the plaintiff in the absence of the immunity.").

11. The superior court's decision can be affirmed on any basis appearing in the record. *See Romann v. State, Dep't of Transp. & Pub. Facilities*, 991 P.2d 186, 190 n. 10 (Alaska 1999).

12. *See Kooly*, 958 P.2d at 1108.

The plaintiffs claim that Forestry had a statutory duty of care under this statute, because it imposes a duty of care on any person who "knows of a fire or sets a fire" on forested land "controlled" by that person. The plaintiffs claim that Forestry "controlled" the land ravaged by the Miller's Reach Fire by virtue of its control over the firefighting activities undertaken there.

Alaska Statute 41.15.110(a) does not create a duty of care on the part of Forestry. The State is explicitly excluded from liability under AS 41.15.110(a) under these circumstances by another statute, AS 41.15.130, which provides that AS 41.15.110 does not apply to "the setting of a backfire" by State officials who are authorized to suppress fires.[13] The Miller's Reach Fire began as just such a backfire, set by Forestry employees, that escaped and eventually destroyed the plaintiffs' property. Therefore, AS 41.15.110(a) explicitly does not apply to the State under these circumstances, and cannot be the basis for a duty of care.

### b. *11 AAC 95.400–.495 does not create a duty of care.*

■ The plaintiffs do not argue that any administrative regulations create a duty of care; however, Forestry raises the possibility that 11 AAC 95.400.495 could do so. This section of the Alaska Administrative Code, entitled "Forest Fire Protection," contains various regulations concerning fire protection and the responsibilities of the State Department of Natural Resources.

However, none of the provisions in this section can reasonably be construed to create a duty of care for Forestry. Instead, these regulations concern the procedure for granting burning permits for permitted burns,[14] the Department's authority to close lands prone to fire on an emergency basis,[15] the Department's responsibility to comply with state environmental regulations,[16] and requirements for saw equipment used in forestry operations.[17]

### c. *Forestry's internal rules and guidelines do not create a duty of care.*

■ The plaintiffs do not explicitly argue that a duty of care arises from Forestry's own internal rules and guidelines, although they implicitly do so by arguing that Forestry was negligent because it violated these rules and guidelines.

In *Estate of Day v. Willis,* we held that an internal administrative and training manual used by police did not impose on the police a duty of care towards fleeing suspects.[18] Similarly, in this case Forestry's internal rules and guidelines do not create a duty of care for Forestry.

### 2. *Forestry owed the plaintiffs a duty of care as a matter of public policy.*

■ In the absence of a statutory duty of care, a duty may also be imposed by public policy.[19]

■ It is well established that, when the State or a subdivision of the State chooses to conduct firefighting operations, it owes a duty of care to those whose lives and property are threatened by the fire to conduct those operations non-negligently. In *Adams v. City of Tenakee Springs,* we affirmed a jury verdict finding no negligence on the part of a

13. AS 41.15.130 states:
 *Backfires excluded.* AS 41.15.010–41.15.170 do not apply to the setting of a backfire under the direction of an officer or employee of the United States or the state who is authorized to prevent or suppress fires.

14. *See* 11 AAC 95.410–.440; 11 AAC 95.490.

15. *See* 11 AAC 95.450–.460.

16. *See* 11 AAC 95.470.

17. *See* 11 AAC 95.480.

18. 897 P.2d 78 (Alaska 1995). In *Estate of Day* we stated:
 The Estate had asserted in *Day I* that a source of duty could be derived from the defendants' internal administrative and training manual entitled "Police and Fire, State of Alaska." The court held that even assuming these materials were admissible as evidence of a standard of care, they did not provide a basis for a source of a legal duty. We agree.
 *Id.* at 81 n. 7.

19. *See Kooly v. State,* 958 P.2d 1106, 1108 (Alaska 1998).

city fire department.[20] The jury was instructed that "once it takes on a responsibility to have a fire fighting service, [the city] must conduct the operation in a non-negligent manner."[21] In *City of Fairbanks v. Schaible*, we considered a situation in which a woman died in a fire because the City of Fairbanks fire department negligently failed to save her.[22] In *Schaible*, we found that the City of Fairbanks could be found liable for its negligent firefighting.[23]

Therefore, when Forestry chose to take over the firefighting operations in this case, it assumed a duty to conduct those operations non-negligently. It owed this duty of care to those, including the plaintiffs, whose lives and property were threatened by the fire.[24]

B. *The Plaintiffs' Claims Are Not Barred Under the Alaska Tort Claims Act, AS 09.50.250.*

Under the Alaska Tort Claims Act, AS 09.50.250, the State is immune from certain types of tort claims. Specifically, the State is immune from suit for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."[25]

■ In our recent decision in *State, Department of Transportation & Public Facili-ties v. Sanders*, we discussed "discretionary function" immunity under AS 09.50.250:

In *State v. Abbott*, we recognized that the term "discretionary" in AS 09.50.250 should not be interpreted broadly to encompass all state actions involving discretion. Otherwise, there would be almost no limit to the State's immunity because "almost any act, even driving a nail, involves *some* 'discretion.'"

Instead, we identify "discretionary" acts or functions by examining whether the act or function can be described as "planning" or "operational." A planning decision is one that involves policy formulation. In contrast, an operational decision involves policy execution or implementation. Only acts or functions occurring at the planning level are entitled to immunity as discretionary functions under AS 09.50.250.

Under the planning/operational test, "liability is the rule, immunity the exception."[26]

So, the State is immune for discretionary functions that are planning decisions involving policy formulation. On the other hand, there is no immunity for decisions that are merely "operational": these include decisions that are executions or implementations of policy already formulated.

Our analysis is driven by the underlying policy of AS 09.50.250, which is to limit the

---

**20.** 963 P.2d 1047 (Alaska 1998).

**21.** *Id.* at 1049.

**22.** 375 P.2d 201 (Alaska 1962) (finding city liable for negligent firefighting but applying rule only prospectively), *overruled in part by Scheele v. City of Anchorage*, 385 P.2d 582, 583 (Alaska 1963) (applying rule retrospectively), *superseded by* AS 09.65.070 (governing municipal firefighting liability); *see Gates v. City of Tenakee Springs*, 822 P.2d 455, 458 (Alaska 1991).

**23.** *See* 375 P.2d at 209–11.

**24.** This conclusion is consistent with our other decisions holding that once the State undertakes to provide a service, it assumes the duty to provide that service non-negligently. *See R.E. v. State*, 878 P.2d 1341, 1347–48 (Alaska 1994) (holding that, having undertaken the responsibility of inspecting and licensing daycare facilities, the State had a duty to do so non-negli-gently, where plaintiffs' children were abused by a daycare facility licensed by the State); *City of Kotzebue v. McLean*, 702 P.2d 1309, 1313–14 (Alaska 1985) (holding that, because the city undertook to provide police protection, it assumed the duty to provide protection non-negligently— to take reasonable care to protect the victim of a threatened attack); *Williams v. Municipality of Anchorage*, 633 P.2d 248, 251 (Alaska 1981) (holding that, having undertaken to provide and install the ladder at a municipality dock, the municipality had a duty to exercise reasonable care to provide for the safety of those using it); *Adams v. State*, 555 P.2d 235, 240–241 (Alaska 1976) (holding that, having undertaken to carry out fire code inspections, the State had a duty of reasonable care to carry them out and enforce fire regulations non-negligently).

**25.** AS 09.50.250(1).

**26.** 944 P.2d 453, 456 (Alaska 1997) (internal citations omitted).

courts' involvement in policy questions best decided by the other branches of government.[27] This explains our abstention from interference with policy-based "discretionary" functions.

The superior court below held that all of the plaintiffs' claims were barred under AS 09.50.250(1), and adopted the reasoning of the oral ruling issued by Judge Cutler in the parallel *Bartek v. State* action: that the State was immune because its actions all involved "the balancing [of] a variety of social, economic and policy factors." The superior court held that none of the actions challenged by the plaintiffs involved non-immune operational decisions made "at the fire truck" that would not be subject to immunity. However, the court refused to hold that all actions undertaken in the course of firefighting would necessarily be immune; rather, the superior court concluded that in the case before it, all of the actions challenged by the plaintiffs were discretionary and not operational.

We will first address the argument made by Forestry that all firefighting decisions are necessarily discretionary planning decisions. Because we reject Forestry's argument, we must also consider the individual allegedly negligent decisions made by Forestry, and whether under the circumstances these decisions were "planning" or "operational" decisions.

    1.  *Firefighting decisions are not necessarily "discretionary" planning decisions subject to immunity under AS 09.50.250.*

■ Forestry's main argument, rejected by the superior court below, is that all firefighting decisions are necessarily bound up with policy formulation, and therefore all of Forestry's allegedly negligent decisions are "discretionary" and subject to immunity under AS 09.50.250. Forestry argues that all tactical decisions made at the scene of a fire involve policy formulation, because firefighters necessarily balance competing economic, political, and social considerations when making tactical decisions. The essence of Forestry's argument is contained in a single paragraph in its brief:

> [Firefighters'] tactical decisions balance policy factors that impact the course of the particular suppression, the readiness for the next fire and the extent, and the likely path of fire destruction. For example, how and when Forestry uses a local fire crew determines whether the crew will be exhausted or available to respond to fight a structure fire. The decisions to use water . . . impact the calculus of fire risk for persons near and far.

Forestry also states, more generally, that all firefighting decisions made in the field have a "planning" component:

> Because of the volatility of fires, planning and implementation are not distinct, but are intertwined and compressed into the same decisions, made at the scene by firefighters responding to what is imperfectly revealed to them as the wildfire develops.

Forestry argues that every firefighting decision is a policy decision because each decision necessarily has an impact on other fires and fire risks, and Forestry's ability to fight other fires and protect other lands. By quoting from *Miller v. United States*,[28] Forestry also implies that firefighting decisions may also balance considerations of cost, public safety, and resource damage.

We reject this argument. Forestry's argument is not supported by the many authorities cited by Forestry. First of all, the text of the relevant sections of the Alaska Tort

---

**27.** We stated in *Sanders:*

The test focuses on the policy behind the discretionary immunity doctrine for guidance in determining whether a given act should receive immunity. "The policy underlying immunity is the necessity for 'judicial abstention in certain policy-making areas that have been committed to other branches of government.' " "This policy in turn is based upon notions of separation of powers, and limitations on this court's ability to reexamine the questioned decision and the considerations that entered into it."

*Id.* at 456–57 (internal citations omitted).

**28.** 163 F.3d 591, 595 (9th Cir.1998) ("[T]he Forest Service's decision regarding how to attack a fire involved a balancing of considerations, including cost, public safety, firefighter safety, and resource damage.").

Claims Act does not support the proposition that all firefighting activities are "discretionary."[29] As the plaintiffs point out, the Act does explicitly immunize some specific activities: quarantines and activities involving the use of an ignition interlock device.[30] It also forecloses specific torts: assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, and interference with contract rights. However, there is no mention of firefighting, or anything like firefighting.[31] Under the principle *expressio unius est exclusio alterius,* courts presume that a statute designating only certain things or acts excludes all things or acts not designated.[32] Therefore, we conclude that the legislature did not intend to immunize the entire class of firefighting activities.[33]

Secondly, in our numerous decisions that have considered "discretionary function" immunity, we have never held that an entire class of decisions, such as those made in the course of firefighting operations, are *necessarily* bound up with policy considerations. Instead, our analysis has in every case focused on government decisions that under the circumstances of each case either did or did not constitute planning and policy considerations.[34] Indeed, in our most recent "dis-

29. *See* AS 09.50.250.

30. *See* AS 09.50.250(2), (4).

31. *See* AS 09.50.250.

32. *See Boudette v. Barnette,* 923 F.2d 754, 756–57 (9th Cir.1991); 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:23,304 (6th ed.2000). This principle applies when the statute does not also have a general term.

33. Other states have explicitly made some or all firefighting activities immune by statute. *See* Cal. Govt.Code § 850.4 (West 1995); Kan.Stat. Ann. § 75–6104(n) (2000); Okla.Stat.tit. 51, § 155(6) (2000). The Alaska legislature has not done so.

34. *See Guerrero v. Alaska Hous. Fin. Corp.,* 6 P.3d 250, 261–62 (Alaska 2000) (reversing finding of immunity because it was possible that the State's allegedly negligent design of housing project involved operational decisions); *Brady v. State,* 965 P.2d 1, 16–17 (Alaska 1998) (finding immunity for State's forest management decisions in response to a beetle epidemic because these decisions simply translated basic directives from the Alaska statutes into policies); *Adams v. City of Tenakee Springs,* 963 P.2d 1047, 1050–51 (Alaska 1998) (fire department staffing decisions were planning decisions because they were fundamentally "resource allocation" decisions); *State v. Sanders,* 944 P.2d 453, 459–60 (Alaska 1997) (decision to allow airport vehicles on a road was planning decision; decisions implementing this policy were operational decisions); *Estate of Arrowwood v. State,* 894 P.2d 642, 645–46 (Alaska 1995) (State's decision not to close a highway in icy conditions involved balancing of policy considerations); *R.E. v. State,* 878 P.2d 1341, 1348–50 (Alaska 1994) (decision to license daycare facilities involved policy considerations, but implementation decisions within confines of existing policies were operational); *Morry v. State,* 872 P.2d 1209, 1211–13 (Alaska 1994) (decision to enact regulations involved policy considerations because Alaska statutes authorizing regulations explicitly vested regulatory agency with discretionary policymaking authority); *Gates v. City of Tenakee Springs,* 822 P.2d 455, 459 (Alaska 1991) (decision by city to move landowner's fence on public right-of-way was planning decision; decision of how to move the fence was operational decision); *Owsichek v. State, Guide Licensing & Control Bd.,* 763 P.2d 488, 498–99 (Alaska 1988) (decisions made under administrative "exclusive guide area" program involved policy considerations because program vested administrative agency with policymaking powers, which were used by agency to create "exclusive guide areas" in a "major policy initiative"); *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 156 (Alaska 1987) (governor's supervisory acts involved fundamental policy determinations); *Division of Corrections, Dep't of Health & Soc. Servs. v. Neakok,* 721 P.2d 1121, 1133–34 (Alaska 1986) (day-to-day decisions made by parole officers in the course of formulating parole plans and supervising parolees were operational); *Freeman v. State,* 705 P.2d 918, 919 (Alaska 1985) (decision not to institute dust-control measures on highway was a policy decision); *Plancich v. State,* 693 P.2d 855, 857–58 (Alaska 1985) (decision to build public seaplane dock was planning decision, but day-to-day operations decisions were operational); *Earth Movers of Fairbanks, Inc. v. State,* 691 P.2d 281, 283–84 (Alaska 1984) (state trooper's good faith determination of his authority was "discretionary function"); *Industrial Indemn. Co. v. State,* 669 P.2d 561, 563–65 (Alaska 1983) (decision not to build guardrail on highway was planning decision); *Rapp v. State,* 648 P.2d 110, 110 (Alaska 1982) (decision to install stop sign instead of traffic signal at intersection was planning decision); *Moloso v. State,* 644 P.2d 205, 218–19 (Alaska 1982) (decision to reroute highway was planning decision; implementation decisions were operational); *Wainscott v. State,* 642 P.2d 1355, 1357 (Alaska 1982) (decision to install flashing traffic light instead of traffic signal at intersection was planning decision); *Johnson v. State,* 636 P.2d 47, 65–66 (Alaska 1981) (decision to build railroad

cretionary function" decision, we expressed skepticism that an entire class of State actions could be inherently bound up with policy formulation: "[W]hat qualifies as a matter of basic planning ... often depends more on the factual circumstances ... than it does on the actions' inherent nature." [35]

Instead, we have consistently held that, for all State activities,. the State's decision to engage in an activity is an immune "planning" decision, while the decisions undertaken in implementing the activity are operational, as long as the implementation does not involve the consideration of policy factors. For example, in *R.E. v. State*, we considered a case in which plaintiff parents brought suit against the State, Division of Family and Youth Services for negligently licensing daycare facilities in which the plaintiffs' children were abused.[36] We held that

the initial decision to create a licensing scheme was an immune planning decision, but that the decisions undertaken in implementing this policy, such as decisions to license and relicense a particular facility, were operational decisions not subject to immunity:

> [W]ithin the confines of [then] existing policies and budgetary constraints, DFYS had the duty to exercise due care in performing its functions. Once DFYS formulated its original policy, it was required to act within the confines of that policy or be exposed to liability for failure to do so.[37]

In many other decisions, we have held that the State was immune for policy decisions to engage in or allow an activity, but was not immune for operational decisions undertaken in the course of implementing that policy.[38]

---

crossing was planning decision; implementation decisions were operational); *Japan Air Lines Co., Ltd. v. State*, 628 P.2d 934, 937–38 (Alaska 1981) (design decisions concerning taxiway at airport were operational because "broad policy factors" were not concerned); *Urethane Specialities, Inc. v. City of Valdez*, 620 P.2d 683, 688–89 (Alaska 1980) (decision to issue consumer warning was planning decision; decision as to content of warning was operational); *Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979) (decision to maintain highway turnout was planning decision; however, maintenance decisions were operational); *Jennings v. State*, 566 P.2d 1304, 1311–12 (Alaska 1977) (street design and safety measures decisions were discretionary); *Wallace v. State*, 557 P.2d 1120, 1124 (Alaska 1976) (decision to inspect construction site was planning decision; decisions carrying out inspection were operational); *Adams v. State*, 555 P.2d 235, 243–44 (Alaska 1976) (decision to inspect for fire code violations was planning decision; decisions implementing inspection were operational); *State v. I'Anson*, 529 P.2d 188, 193–94 (Alaska 1974) (decisions concerning striping and signage on highway were operational); *State v. Stanley*, 506 P.2d 1284, 1291 (Alaska 1973) (decision to seize fishing boat was planning decision; decisions implementing seizure were operational); *State v. Abbott*, 498 P.2d 712, 722 (Alaska 1972) (decision to maintain highway during winter was planning decision; decisions implementing maintenance were operational).

35. *Guerrero*, 6 P.3d at 261–62.

36. 878 P.2d 1341 (Alaska 1994).

37. *Id.* at 1349–50 (internal quotations, citations, and emphasis omitted).

38. *See Sanders*, 944 P.2d at 459 (decision to allow airport vehicles on a road was planning decision; decisions implementing this policy were operational decisions); *Gates*, 822 P.2d at 459 (decision to move fence was planning decision; decision on *how* to move the fence was operational); *Neakok*, 721 P.2d at 1133–34 (parole board's decisions formulating policy were planning decisions; day-to-day decisions made by parole officers in the course of formulating parole plans and supervising parolees were operational); *Freeman*, 705 P.2d at 919 (decision to maintain highway for public use was planning decision; implementation decision not to institute dust-control measures on highway was a policy decision because it involved consideration of "basic policy factors"); *Plancich*, 693 P.2d at 858 (decision to build public seaplane dock was planning decision, but day-to-day operations decisions were operational); *Moloso*, 644 P.2d at 218–19 (decision to reroute highway was planning decision; implementation decisions were operational); *Johnson*, 636 P.2d at 65–66 (decision to build railroad crossing was planning decision; implementation decisions were operational); *Japan Air Lines*, 628 P.2d at 937–38 ("basic policy decision" to build taxiway at airport was planning decision; design decisions concerning taxiway at airport were operational because "broad policy factors" were not concerned); *Urethane Specialities, Inc.*, 620 P.2d at 688–89 (decision to issue consumer warning was planning decision; decision as to content of warning was operational); *Carlson*, 598 P.2d at 973 (decision to maintain highway turnout was planning decision; however, maintenance decisions were operational); *Wallace*, 557 P.2d at 1124 (decision to inspect construction site was planning decision; decisions carrying out inspection were operational); *Adams*, 555 P.2d at 243–44 (decision to inspect for fire code violations was planning

Also, no authorities from other jurisdictions fully support Forestry's claim that all firefighting activities should be immune; and some jurisdictions have explicitly held that some firefighting activities are operational.

Decisions applying the Federal Tort Claims Act [39] also immunize "discretionary functions," but apply a slightly different test than the one we have used for the Alaska Tort Claims Act. Under the federal test, discretionary decisions are those that are "susceptible to a policy analysis grounded in social, economic, or political concerns." [40] None of the federal decisions cited by Forestry applying this test support the proposition that *all* firefighting activities are immune "discretionary functions." Instead, in these decisions the courts found that *particu-*

lar firefighting decisions, in *particular* circumstances, involved policy determinations and were immune. [41] Indeed, one of these decisions explicitly stated that whether the firefighting decision at issue involved policy formulation depended on the particular circumstances. [42]

And decisions by other state courts do not support Forestry's argument. None of the state court cases cited by Forestry are applicable, since they involved applications of tests that differ significantly from our planning/operational test for discretionary function immunity. [43] Also, two state court decisions and one federal case applying Texas law have held that some state or municipal firefighting decisions are planning decisions, while others are operational decisions. [44]

decision; decisions implementing inspection were operational); *Stanley,* 506 P.2d at 1291 (decision to seize fishing boat was planning decision; decisions implementing seizure were operational); *Abbott,* 498 P.2d at 722 (decision to maintain highway during winter was planning decision; decisions implementing maintenance were operational).

39. *See* 28 U.S.C. §§ 2671–80 (2000).

40. *Miller v. U.S.,* 163 F.3d 591, 595 (9th Cir. 1998).

41. *See Kelly v. U.S.,* 241 F.3d 755, 759–64 (9th Cir.2001) (specific training decision for contract pilots used in firefighting is discretionary policy decision because it necessarily implicated competing policy considerations); *Miller,* 163 F.3d at 595–96 (where Forest Service had *multiple* fires in the same area to fight, firefighting strategy choices were discretionary because "competition for resources" required balancing of costs, minimizing resource damage, and protecting private property); *Parsons v. U.S.,* 811 F.Supp. 1411, 1414–21 (E.D.Cal.1992) (same, multiple fires); *Defrees v. U.S.,* 738 F.Supp. 380, 384–85 (D.Or. 1990) (same, multiple fires); *Thune v. U.S.,* 872 F.Supp. 921, 924–25 (D.Wyo.1995) (where Forest Service was forced to fight fire started as controlled burn, testimony indicated that firefighting decisions were discretionary because they were "the result of developed strategies and policies"); *Pope & Talbot, Inc. v. Department of Agric.,* 782 F.Supp. 1460, 1465–67 (D.Or.1991) (forest *closure* decisions before fire season are discretionary policy decisions because these decisions involved weighing of costs and benefits).

42. *See Defrees,* 738 F.Supp. at 384–85 (interpreting *Rayonier v. U.S.,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957)).

43. *See Biloon's Elec. Serv., Inc. v. City of Wilmington,* 401 A.2d 636, 643–44 (Del.Super.1979) (refusing to apply any "arbitrary" planning/operational distinction, but stating that firefighting decisions based on policy considerations are immune); *Wright v. State of Florida,* 540 So.2d 830, 831 (Fla.App.1988) (finding no duty of care for firefighting; immunity not discussed); *Chandler Supply Co. v. City of Boise,* 104 Idaho 480, 660 P.2d 1323, 1328–29 (1983) (granting immunity for both operational and planning decisions "necessary to the performance of traditional *governmental* functions"), *reversed by Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986) (adopting planning/operational test), *both cases superseded by* Idaho Code § 6–904A (1988); *City of Hammond v. Cataldi,* 449 N.E.2d 1184, 1186–87 (Ind.App.1983) (applying "discretionary/ministerial" test that grants immunity if the decision is merely discretionary), *modified by Peavler v. Monroe County Bd. of Comm'rs,* 528 N.E.2d 40, 46 (Ind.1988) (abandoning discretionary/ministerial test and adopting planning/operational test); *Harland Enters., Inc. v. Commander Oil Corp.,* 64 N.Y.2d 708, 485 N.Y.S.2d 733, 475 N.E.2d 104, 105 (1984) (immunizing firefighting because it is a discretionary "governmental function"). Another case, *Frankfort Variety, Inc. v. City of Frankfort,* 552 S.W.2d 653, 655 (Ky.1977) appeared to immunize firefighting under theory of generalized duty to public; however, this decision was overruled by *Gas Serv. Co., Inc. v. City of London,* 687 S.W.2d 144 (Ky.1985).

44. *See Hill v. City of Houston,* 991 F.Supp. 847, 852–53 (S.D.Tex.1998) (using version of planning/operational test for municipal immunity, holding that "negligent implementation" of fire department firefighting policies is not discretionary; applying Texas law); *Harry Stoller & Co. v. City of Lowell,* 412 Mass. 139, 587 N.E.2d 780, 785 (1992) (using planning/operational test for

In sum, we decline Forestry's invitation to declare that all possible firefighting decisions made by the State are necessarily policy-based planning decisions subject to immunity. This would be a radical step that is not consistent with our past decisions or any other authorities.

2. *On remand, Forestry's allegedly negligent acts must be examined individually to determine if they are "planning" or "operational" decisions.*

■■■ Because not all firefighting decisions made by Forestry are automatically planning decisions subject to immunity, the particular decisions in this case that are alleged to be negligent must be examined to determine if they are "planning" decisions or "operational" decisions.

The plaintiffs claim that the following Forestry decisions were negligent:

(1) Forestry allowed its personnel to work at the fire site while under the influence of alcohol and/or illegal drugs.

(2) Forestry failed to conduct any firefighting activities at all during the night of June 2–3.

(3) Forestry's incident commander, as well as another Forestry crew boss, failed to investigate the column of smoke rising from the out-of-control burnout during the evening of June 3 while all Forestry personnel were away from the fire eating dinner.

(4) Forestry failed to construct a "fire line" around the original sixty-acre fire.

(5) Forestry used inadequate pumps, hoses, tanks, and water supplies to fight the fire instead of using superior available resources supplied by the local fire departments.

(6) Forestry failed to conduct an adequate "mop-up" of the original fire.

(7) Forestry started burnouts in improper places and in an improper manner and failed to control them (including the burnout that spread out of control and created the Miller's Reach Fire).

(8) Forestry failed to post lookouts around the original fire (including, importantly, the evening of June 3, while the burnout started by Forestry was burning out of control and all Forestry employees were away from the fire eating dinner).

The parties have not systematically addressed these individual allegations in their briefs,[45] and this case was decided below on a Civil Rule 12(b)(6) motion, with no factual development. Based on the limited factual record before us, we decline to decide whether each of these allegations concerns "planning" decisions or "operational" actions. On remand, the superior court should permit the parties to conduct discovery, and each of these allegations should be carefully considered in the context of any further summary judgment proceedings. The superior court should make a separate determination for each of these allegations following the principles announced in this opinion and in our other decisions concerning discretionary function immunity.

To provide additional guidance, we note that at least some of the plaintiffs' allegations appear to concern non-immune, "operational" actions.

■■■ We agree with the Massachusetts Supreme Judicial Court, which stated in *Harry Stoller & Co. v. City of Lowell* that "[t]here are aspects of firefighting that can have an obvious planning or policy basis."[46] Such aspects include the number and location of fire stations, the amount of equipment to

municipal immunity, holding that firefighting decisions concerning allocation of resources are planning decisions; tactical decisions are operational decisions); *Invest Cast, Inc. v. City of Blaine,* 471 N.W.2d 368, 370–71 (Minn.App. 1991) (holding that initial firefighting deployment decisions are planning decisions; tactical decisions concerning "how the firefighter personnel actually fight the fire" are operational decisions).

45. Forestry concentrates its argument on the general proposition that all tactical firefighting decisions are planning decisions. The plaintiffs do list most of the decisions mentioned above and assert that they are operational, but do not systematically and separately discuss each of the decisions.

46. 412 Mass. 139, 587 N.E.2d 780, 785 (1992).

purchase, the size of fire departments, and other aspects involving the allocation of financial resources.[47] In addition, certain on-the-scene firefighting tactical decisions may be considered discretionary because they entail resource allocation decisions or considered decisions of firefighting policy that are properly vested in the officials in charge. A decision whether or not to use a backfire may be an example.[48] But not all conduct implementing tactical decisions should necessarily be immune.

 As noted by the Massachusetts court, other firefighting actions are clearly operational. The court in *Harry Stoller & Co.* noted that "governmental immunity does not result automatically just because the governmental actor had discretion. Discretionary actions and decisions that warrant immunity must be based on considerations of public policy."[49] The Massachusetts court held that the decision to use lower water pressure that rendered a sprinkler system inoperable was a decision made at the operational level, because it was one that "involved no policy choice or planning decision."[50] Forestry's alleged failure to prevent its employees from working under the influence of alcohol and illegal drugs clearly cannot be viewed as a policy choice or planning decision. Moreover, although we are without the benefit of a fully developed record, it is difficult to tell why certain firefighting decisions made in the field, such as the alleged failure to build a firewall, the failure to post lookouts to watch the burnout during the June 3 dinner, or the failure to conduct an adequate "mop-up," should not be considered to be operational in nature.

The superior court will benefit from further factual development of these allegations before determining if the plaintiffs' allegations concern conduct that is "planning" or "operational" in nature.

## V. CONCLUSION

Because Forestry had a duty of care to fight the initial fire in this appeal non-negligently, and because the plaintiffs alleged at least some acts of operational negligence on the part of Forestry, we REVERSE the dismissal below. Because the superior court's award of attorney's fees was based on that dismissal, that award is also REVERSED. We REMAND for further proceedings consistent with this opinion.

EASTAUGH and BRYNER, Justices, not participating.

---

47. See id.; see also Adams v. City of Tenakee Springs, 963 P.2d 1047, 1050–51 (Alaska 1998) (fire department staffing decisions were planning decisions because they were fundamentally "resource allocation" decisions). The decisions cited in footnotes 38 and 41, *supra*, also cast light on the dividing line between discretionary and nondiscretionary decisions in a firefighting context.

48. See AS 41.15.130 (exempting backfires authorized by state officials from statutes regulating forest fires).

49. 587 N.E.2d at 785.

50. Id. at 784.