**POPE & TALBOT, INC., Plaintiff,**

v.

**DEPARTMENT OF AGRICULTURE, UNITED STATES of America, Defendant.**

**Civ. No. 91–6050–JO.**

United States District Court, D. Oregon.

Dec. 4, 1991.

James P. Martin, Schwabe, Wiliamson & Watt, Portland, Or., for plaintiff.

James L. Sutherland, U.S. Attorney's Office, Eugene, Or., for defendant.

## ORDER

ROBERT E. JONES, District Judge:

Pope & Talbot ("Pope") brings this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, for negligence. The court has jurisdiction under 28 U.S.C. § 1346(b). Timely tort claims notice was received by the United States on June 6, 1990.

The dispute arose because of a forest fire, commonly known as the Shady Beach Fire, that started in the Willamette National Forest on September 12, 1988. The fire spread to land owned by Pope and destroyed 960 acres of Pope's timberland.

The cause of the fire is unknown, however, it is suspected, after a Forest Service investigation, that the fire was human caused.

Pope alleges that the United States was negligent "[i]n failing to close its land and/or deny access to the public under the weather conditions and potential and known fire hazards then and there existing which defendant knew or in the exercise of reasonably care should have known or anticipated." Complaint (# 1), p. 3.[1]

---

1. The complaint contains another allegation of negligence regarding personnel and equipment. Pope withdrew that allegation. Memorandum in Opposition (# 17), p. 3, n. 1.

The United States moves to dismiss or, in the alternative, for summary judgment because the decision whether to close the forest was a discretionary decision, 28 U.S.C. § 2860(a), and because ORS 105.655–680 entitles the United States to immunity.[2]

■ As a jurisdictional matter, before a party may sue the United States for money, the United States must waive its sovereign immunity. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). While the FTCA is such a waiver, the FTCA is only a limited waiver. Title 28 U.S.C. § 2680(a) provides that the FTCA does not apply to "[a]ny claim based ... upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

■ The court, in deciding whether to grant the United States' motion to dismiss based lack of jurisdiction, "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy*, 850 F.2d at 560. The consideration of extrinsic evidence on a motion to dismiss for lack of subject matter jurisdiction does not render the motion one for summary judgment. *Id.* at 560.

### "Discretionary Function" Exception

■ The Supreme Court has recently discussed the "discretionary function" exception.

The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," ... and "it is the nature of the conduct, rather than the status of the action," that governs whether the exception applies.... The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive."

*United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (citations omitted). Even if the " 'conduct involves an element of judgment,' " not all judgments are protected by the discretionary function exception. *Gaubert*, 111 S.Ct. at 1273. (citations omitted). "[T]he purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Gaubert*, 111 S.Ct. at 1273 (citations omitted). Therefore, "the exception 'protects only governmental actions and decisions based on considerations of public policy.' " *Gaubert*, 111 S.Ct. at 1274 (citations omitted).

Where Congress has delegated the authority to an independent agency or to the executive branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs. In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

---

**2.** ORS 105.655–680 is Oregon's Public Recreational Use of Private Lands Act. "An owner of land owes no duty of care to keep the land safe for entry or use by others for any recreational purpose or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering...." ORS 105.665(1). Further, "[a]n owner of land who either directly or indirectly invites or permits any person to use the land for any recreational purpose without charge does not thereby ... [a]ssume responsibility for or incur liability for any ... loss to any ... property caused by an act or omission of that person." ORS 105.665(2). Notwithstanding ORS 105.665, a land owner is liable "[f]or the wilful, wanton and reckless failure ... to guard or warn against a ... known dangerous activity on the land." ORS 105.675(1).

*Gaubert,* 111 S.Ct. at 1274.[3]

In sum,

[u]nder the applicable precedents,[4] therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation.... If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulations creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Gaubert,* 111 S.Ct. at 1274 (footnote not in original). That is, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 111 S.Ct. at 1274. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 111 S.Ct. at 1275 (footnote omitted).

■ Even if particular actions are negligent, those actions are protected if the actions fall within the discretionary function exception. *See Gaubert,* 111 S.Ct. at 1275 & 1279; *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1029 (9th Cir.1989) ("[N]egligence is simply irrelevant to the discretionary function inquiry.").

Because "[t]he relevant statutory provisions were not mandatory ... [and] '[t]he agencies ... were not bound to act in a particular way; the exercise of their authority involved a great 'element of judgment of choice,'" *Gaubert,* 111 S.Ct. at 1277, the Court held that the challenged actions involved the exercise of discretion in furtherance of public policy goals; the plaintiff's complaint was dismissed.[5]

■ Under the statutory and regulatory standards, and under the Forest Service Manual, the Forest Service's decisions regarding forest closure are not specific and mandatory. *See* 16 U.S.C. § 551 (footnote 3, *supra*). Title 36 C.F.R. § 261.50 states that

(a) [t]he Chief, each Regional Forester, each Experiment Station Director ... and each Forest Supervisor *may* issue orders which close or restrict the use of described areas within the area over which he has jurisdiction....

(emphasis added). The Forest Service Manual [FSM] provides:

**3.** Title 16 U.S.C. § 551 provides that

[t]he Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests ... and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests ... from destruction....

Congress has delegated authority to the executive branch, the Secretary of Agriculture, to make rules and regulations to protect the forests.

**4.** The essential Supreme Court precedents are *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and *Berkovitz v. United*

*States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

**5.** *Gaubert* was dismissed on a motion for failure to state a claim. The standard the Court applied was accepting all the complaint's allegations as true, does the complaint state a claim. *Gaubert,* 111 S.Ct. at 1276 (citing *Berkovitz v. United States,* 486 U.S. at 540, 108 S.Ct. at 1960). The Court limited its inquiry to the face of the complaint. *Gaubert,* 111 S.Ct. at 1279.

This court is faced with a motion to dismiss for lack of jurisdiction. According to *McCarthy,* the court's inquiry is not limited to the face of the complaint and the court does not have to accept the complaint's allegations as true. *McCarthy,* 850 F.2d at 560.

However, under either standard, Fed.R.Civ.P. 12(b)(1) or Fed.R.Civ.P. 12(b)(6), Pope's complaint fails because Mr. Grace's decision falls within the discretionary function exception of the FTCA.

To the extent possible, wilderness's jointly administered by the Willamette and Deschutes National Forests must be open to public use, free of unnecessary restrictions. When the risk is so great that it cannot be tolerated by both Forests, and significant and substantial efforts in prevention activities cannot satisfactorily mitigate that risk, restrictions *may* be applied.

Exhibit 2, attached to Affidavit of Richard E. Grace (# 14), 5115.4 (emphasis added).

When the fire started, the Willamette National Forest had been partially closed since August 26, 1988. The forest was closed to industrial, logging, and off-road motor vehicle use, and campfires were restricted to established campgrounds. Statement of Facts (# 11), p. 2. "Historically, the Willamette National Forest has not had a high risk associated with the recreation public." Affidavit of Richard E. Grace (# 14), p. 5.

During August and September of 1987, numerous fire fighting resources, including those of the Willamette National Forest, had been committed to the Yellowstone fires and other fires in the west. During this period of time, the weather was hot and dry. I consulted with adjunct forest fire and recreation staff officers about closing the National Forest to entry prior to and after the Shady Beach Fire. I would consider daily the risks, the amount of effort and resources it would take to close the forest, the availability of fire suppression resources, the recreation public's need for entry, the effect of the high cascade buck hunt and state wide archery hunt, what was happening locally with new fire starts and weather pattern.... [Unlike a state administered fire closure,] [f]or the Forest Service to initiate a total closure, a major consideration is the commitment of personnel to administer the entry points. The Willamette National Forest stretches a 126 miles north to south with multiple road entry points. In addition, closure is seldom made on an individual forest basis. I called adjacent forests (the Deschutes, Mt. Hood and Umpqua) on a daily basis. Each of these forests agreed that total closure was not necessary or feasible.

Affidavit of Richard E. Grace (# 14), p. 5–6.

First, Pope claims that under the "Pacific Northwest Region Fire Management Action Plan," ("Plan"), *see* Exhibit 3, attached to Affidavit Richard E. Grace (# 14), the Forest Service established criteria and conditions for the forest's closure. Pope contends that the criteria for forest closure detailed in the Plan were met, but notwithstanding the United States negligently failed to close, facilitating the fire's creation.

The goal of section 14.3 of the Plan is to "[p]rovide guidelines to help managers make rational decisions regarding public restrictions." Exhibit 3, attached to Affidavit of Richard E. Grace (# 14), 14.3. While "[c]riteria exists for the regulation of industrial activity ... no systematic approach has been developed to regulate public use." *Id.* The Plan identifies four phases of public restrictions: fire precautionary period, restrict open fires, contract and permit closure, and complete woods closure.

The Plan provides for complete woods closure as follows:

[t]he following criteria would have to exist to completely close the woods to public access:

1. A complete industrial shutdown, *and*

2. Fire danger indices in the "extreme" range, *and*

3. Conditions must be severe over a large geographical area, such as half a state, *and*

4. An expected influx of Forest visitors, such as occurs on major holidays or beginning of hunting season, *and/or*

5. Going large fires and/or firefighting forces are depleted.

The implementation of Phase I and III is quite simple and is considered routine. Phases II, and IV require the development of a thorough rationale for the action, coordination with other agencies,

and concurrence with the Regional Office before they are implemented.

To the extent possible, the woods must be open to public use fee of unnecessary restrictions. When the risk of large damaging fires is so great it cannot be tolerated then closures *may* be used.

Exhibit 3, attached to Affidavit of Richard E. Grace (# 14), 14.3 (emphasis added).

Pope's reliance on the Plan must fail. First, there was not an expected influx of visitors and there was not a depletion of forces. *See* Deposition of R. Grace, attached to Government's Response (# 19).[6] Thus, even if the Plan required Mr. Grace to close the forest once the five requirements were met, the five requirements had not been met.[7]

■ Second, and more importantly for jurisdictional purposes, the existence of the five factors does not require that the forest be closed. Rather, the five factors would have to exist to completely close the woods, but the mere existence of these factors does not mandate that the woods be closed, just that the threshold requirement has been met and the woods may be closed. The final decision whether to close the forest remained with Mr. Grace, depending upon his evaluation and weighing of the public's need for open forests and the costs entailed with closing the forests against the danger of fire.

■ As Pope's second argument, Pope submits that the United States is liable because of the Forest Service's negligence in failing to close the Rigdon Ranger District in violation of the Plan, when such closure was acknowledged to be feasible as articulated in the Rigdon Ranger District Fire Prevention Plan.

The Rigdon Ranger District Fire Prevention Plan of 1988 provides that

[i]n the event of forest closures or restrictions, the District will be governed by FSM [Forest Service Manual] 5115.41 a, b, and c, the Interim Protection Plan, and direction from the Supervisor's Office.

District responsibility concerning closures will be to monitor existing conditions and to inform the Supervisor's Office when particularly hazardous situations develop. Secondly, we will be responsible for enforcement once closures and restrictions are enacted.

We are able to enforce these restrictions through effective signing to indicate closed or restricted areas and the establishment of a fire prevention information checkpoint at the junctions of Roads 23 and 21, which are the primary access routes to the Rigdon District.

Exhibit 7, attached to Memorandum in Opposition (# 17), III.B.

The Rigdon Plan merely guides the district in the event of a closure or restriction. The Rigdon Ranger District Fire Prevention Plan mentions the possibility of forest closure, but does not mandate or even authorize such a closure.

Pope points to the fact that Mr. Grace could have easily closed the Rigdon Ranger District because only two roads served as the primary access routes to the Rigdon

---

**6.** According to Pope, "[t]he criteria established in the ... Plan ... were met during the time period September 1—September 12, 1988." Plaintiff's Statement of Facts (# 18), p. 2. The United States objects to this statement of fact.

Mr. Grace's deposition reveals that the answer to whether an influx of visitors was expected depends on when Labor Day occurred. However, "[o]n September 12th we were beyond Labor Day weekend." Deposition of R. Grace, attached to Government's Response (# 19), p. 28. Further, "[h]igh Cascade buck [hunting season] is not a major influx of visitors." *Id.* at 31.

Notwithstanding major fires, such as in Yellowstone, "we had adequate firefighting forces of every kind, so that part of the criteria was not, in fact, there." *Id.* at 32.

**7.** If the court dismissed Pope's complaint on this basis it would be on a motion for summary judgment. The analysis to lead the court to grant summary judgment would be as follows: The court has jurisdiction under the FTCA because Mr. Grace's decision was a mandatory decision based upon the criteria in the Plan. The discretionary function exception would not apply. However, because Mr. Grace followed the Plan, that is, he did not close the forest because the five factors had not been met, Mr. Grace's decision would have comported with the Plan and in the process furthered the policies behind the Plan. *See Gaubert,* 111 U.S. at 1274.

District. While this may be true, this does not prove that Mr. Grace's decision to not close the Willamette National Forest or even just the Rigdon District did not involve a discretionary decision.

■ Third, but related to the first argument, Pope argues that the Forest Service ... developed a fire management plan which considered the social, economic, and political concerns of closing the forest or parts thereof. Having done so, the choice for Mr. Grace was to determine if the criteria were satisfied and, if so, order the closure. He failed to do so and his decision is not entitled to immunity.

Memorandum in Opposition (# 17), p. 10. That is, Pope argues that the choice whether to close the forest is "governed by objective standards which the government must use due care in following." *Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.1989).

The development of policy by the Forest Service through the Plan did not foreclose Mr. Grace from also developing policy. The Forest Service did not preempt the field.

Mr. Grace, guided by the policy considerations enunciated in the Plan, reached a policy decision after considering various factors; social, the public's need for entry, the high cascade buck hunt, and the state wide archery hunt; economic, the amount of effort and resources to close the forest and the availability of fire suppression resources; and political.[8] Mr. Grace was not required to mechanically determine if certain criteria were met and, if so, close the forest.

Besides, there is nothing to support Pope's implicit assumption that the Plan constitutes objective safety standards. In *Arizona Maintenance*, "[t]he appellant offered the affidavit of a geological engineer stating that the size of the charge in relation to the distance from appellant's wells violated established industry standards."

*Arizona Maintenance* at 1504. The geologist's affidavit relied upon the "Seiscom Delta Chart."

Pope mischaracterizes the Plan in an unsuccessful attempt to overcome the discretionary function exception. "It's not a cookbook, but it's a judgmental thing." Deposition of R. Grace, attached to Government's Response (# 19), p. 48.

Mr. Grace had discretion to act; the criteria within the Plan did not remove Mr. Grace's discretion. Although "[o]nce the government, having balanced economic, social and political considerations, adopts safety standards in the form of specific and mandatory regulations or policy, employees do not have any discretion to violate these standards," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1026–27 (9th Cir.1989), Mr. Grace was not faced with any mandatory or specific rule. The Plan under which Mr. Grace was operating proffered criteria that Mr. Grace *may* consider and what actions Mr. Grace *may* choose to follow. Indeed, the stated goal of section 14.3 is to "[p]rovide guidelines to *help* managers make rational decisions regarding public restrictions." Exhibit 6, attached to Memorandum in Opposition (# 17), 14.3 (emphasis added).

Mr. Grace's deposition testimony only highlights that Mr. Grace was faced with many choices and he, after considering all the factors, arrived at a decision within his discretion not to close the forest.

Could you have ordered the complete woods closure of the Rigdon Ranger District without ordering the complete closure of the Willamette National Forest?

A. That was a prerogative, yes.

. . . .

Q. Did you consider that option?

A. Certainly.

Q. And what did you determine to be the cost to order such a closure?

A. If you're asking me if I put down on paper the actual dollars-and-cents cost

---

**8.** Mr. Grace also based his decision on historical factors: "there has been an average of 63 lightening fires and 47 human caused fires annually." Affidavit of Richard E. Grace (# 14), p. 4.

There is a low risk of fire from recreational use. *Id.* at 5. Mr. Grace also considered the weather pattern and new fire starts.

of posting and administering a closure, we did not put down an exact cost.

We talked. We—I'm talking about the fire managers of the forest and our adjacent forests....

Exhibit 1, attached to Memorandum in Opposition (# 17), p. 13.

Furthermore, Mr. Grace's decision not to close the forest "was the type of decision which by nature 'rested upon practical considerations, including the vital item of costs.'" *Kennewick Irrigation,* 880 F.2d at 1027–28. Mr. Grace's affidavit evidences that the decision whether to close the forests was based upon social, the denial of access to the forest by the public, economic, the costs, and political considerations.

Mr. Grace's decision was not "one governed by objective standards which the government must use due care in following." *Arizona Maintenance Co. v. United States,* 864 F.2d 1497, 1504 (9th Cir.1989). Unlike the decision how much dynamite to use, Mr. Grace's decision whether to close the forest was based upon the appropriate policy considerations; social, economic, and political. The record in the present case establishes the nature of the decision. *Cf. Arizona Maintenance* at 1504 (remanding the question of the initial decision to use dynamite because of the lack of a record regarding whether the decision was based upon objective standards or a policy judgment).

Because the court finds that the decision not to close the forest was a discretionary decision, this court does not have jurisdiction; the United States has not waived its sovereign immunity to be sued for money. The court does not reach the United States' alternative argument in favor of its motion.

*Conclusion*

The United States' motion to dismiss for lack of subject matter jurisdiction (# 9) is GRANTED. This action is DISMISSED.