Marvin McDOUGAL, Plaintiff,

v.

U.S. FOREST SERVICE, Defendant.

Civil No. 99–1038–JO.

United States District Court,
D. Oregon.

April 15, 2002.

---

Gary M. Bullock, Wade V. Regier, Bullock & Regier, Portland, OR, for Plaintiff.

James L. Sutherland, Assistant United States Attorney, District of Oregon, United States Attorney's Office, Eugene, OR, for Defendant.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiff Marvin McDougal brings this action against defendant United States

Forest Service, through the United States, alleging, as relevant, a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*, for damages incurred in relation to a fire in the Strawberry Mountain Wilderness Area in 1996.

On July 31, 2001, I granted in part defendant's motion to dismiss or, alternatively, for summary judgment on certain of plaintiff's damages claims (# 61). On September 17, 2001, I issued a second opinion granting defendant's motion for summary judgment on plaintiff's claim for timber loss (# 65). I deferred ruling on defendant's motion with respect to liability to permit the parties to engage in settlement negotiations.

The parties' settlement efforts failed. As a result, I now return to the issue that I have held in abeyance since July 2001: Whether defendant is immune from liability under the discretionary function exception to FTCA, 28 U.S.C. 2680(a), for its actions with respect to the fire. Having considered the parties' submissions and the arguments made during the hearing on May 21, 2001, I conclude that defendant's actions fall within the discretionary function exception to the FTCA. Defendant's motion for summary judgment on the issue of liability is, therefore, granted and the alternative motion to dismiss is moot.

## FACTUAL BACKGROUND

The fire that gave rise to this action, known as the "Wildcat fire," first started as a lightening strike on July 26, 1996, on a ridge in the center of the Strawberry Mountain Wilderness area at the approximate elevation of 7100 feet. In keeping with various governing laws and documents, and as explained more fully below, the Forest Service decided to manage the fire, which was less than 1/10 acre in size at that time, as a "prescribed natural fire" ("PNF"). Over the next several days, additional lightening strikes ignited additional fires within the parameters of the Wildcat PNF. Everything proceeded as planned until August 9, 1996, when the fire "blew up" and was declared a "wildfire." ·Defendant then undertook to control the fire, but by the time the fire was brought under control, the fire had burned approximately 216 acres of an adjacent ranch, known as the "Oxbow Ranch." At the time of the fire, plaintiff Marvin McDougal was a lessee and an optionee of the Oxbow Ranch.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir.1989).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service*, 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## DISCUSSION

### A. Legal Standards

▮▮▮▮ The United States can be sued only to the extent that it has waived its sovereign immunity. *Reed ex rel. Allen v. U.S. Dept. of Interior*, 231 F.3d 501, 504 (9th Cir.2000). The FTCA, however, provides a waiver of the government's sovereign immunity "for the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employee." 28 U.S.C. § 1346(b)(Supp. IV 1998); *see Kelly v. U.S.*, 241 F.3d 755, 759 (9th Cir.2001). This waiver of immunity is limited, however, by the "discretionary function" exception; that is, the government is not liable for claims

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Where this exception applies, " 'the court lacks subject matter jurisdiction.' " *Kelly*, 241 F.3d at 760 (*quoting GATX/Airlog Co. v. United States*, 234 F.3d 1089, 1094 (9th Cir.2000)).

In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court established a two-part test for use in determining whether the discretionary function exception applies. First, the court must determine whether the challenged action involves an element of choice or judgment. *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. 2755. If it does, then the court must decide " 'whether that judgment is of the kind that the discretionary

function exception was designed to shield * * *.' " *Reed*, 231 F.3d at 504 (*quoting Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)); *see also Kelly*, 241 F.3d at 760. The government bears the burden of proving both prongs. *Kelly*, 241 F.3d at 760.

The first prong is whether the challenged conduct is discretionary: "discretion is the benchmark of this self-referential prong of the discretionary function test." *Kelly*, 241 F.3d at 760 (citation omitted). The existence of some mandatory language is not enough to eliminate discretion. *Id.* at 761. If alleged conduct violates a "specific"[1] and "mandatory directive, whether by statute, regulation or policy," then it is not discretionary, because there is no choice or judgment involved.

The second prong—policy analysis—"is grounded in the notion that the discretionary function exception is designed to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy.' " *Kelly*, 241 F.3d at 760 (*quoting United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). The decision must be susceptible to a policy analysis grounded in social, economic, or political concerns, such as employee and public safety, the agency's goals and duties, the agency's relationship with the public, etc. *See Kelly*, 241 F.3d at 762; *Miller v. U.S.*, 163 F.3d 591, 595 (9th Cir.1998)(Forest Service's decision regarding how to attack a fire involved competing policy considerations including cost, public safety, firefighter safety, and resource damage).

---

1. In *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018 (9th Cir.1989), the Ninth Circuit explained that it has stressed that the requirement under scrutiny must be both "specific and mandatory" to overcome the discretionary function exception. 880 F.2d at 1027 (*citing Starrett v. United States*, 847 F.2d 539, 541–42 (9th Cir.1988)).

■ Significantly, "negligence is simply irrelevant" to discretionary function analysis. *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018, 1029 (9th Cir.1989); *see* 28 U.S.C. § 2680(a). As the court in *Kennewick* explained, "if the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." *Id.; see also Pope & Talbot, Inc. v. Dept. of Agriculture*, 782 F.Supp. 1460, 1463 (D.Or.1991)(Jones, J.)("[e]ven if particular actions are negligent, those actions are protected if the actions fall within the discretionary function exception"); *Reed*, 231 F.3d at 504–505 ( "[e]ven if the exercise of that governmental discretion was ill-advised, it does not make the discretionary function exception inapplicable").

In this case, plaintiff does not contend that any of defendant's decisions fail to satisfy the second prong, policy analysis. Consequently, this opinion addresses only the first prong, the nature of defendant's decisions.

**B.** *The Governing Statutes, Regulations, and Policies*

A pyramid of legislation, regulation, policies, plans, and implementing documents underlie and set the stage for defendant's initial decision to designate the Wildcat fire as a "prescribed natural fire," as well as all of the decisions and various actions that followed. In hierarchical order, these are:

1. In 1964, Congress enacted the Wilderness Act, 16 U.S.C. § 1131 *et seq.* The Strawberry Mountain Wilderness in the Malheur National Forest was added in 1984. The wilderness area consists of approximately 68,700 acres and is administered by the Prairie City Ranger District and Bear Valley Ranger District.

2. Statutory and regulatory direction for management of wilderness areas is found at 16 U.S.C. § 551 (protection of national forests); 16 U.S.C. § 1131 *et seq* (National Wilderness Preservation System); and 36 C.F.R. part 293 (Wilderness Primitive area).

3. Forest Service direction for management of wilderness areas and the use of fires in wilderness areas is found in:

a. GAO Report, Federal Fire Management: Limited Progress in Restarting the Prescribed Fire Program (dated December 1990)(Defendant's Exhibit ("Def's Exh.") 101).

b. Forest Service Manual ("FSM"), Title 5100, Fire Management with supplements (effective December 1991)(Def's Exh. 102).

c. FSM, Title 2300 and Region 6 Supplement 2320 (effective August 8, 1996)(Def's Exh. 103).

d. Environmental Assessment for Wilderness Prescribed Natural Fire Program, Malheur National Forest, Baker and Grant Counties, Oregon (Def's Exh. 104).

e. Decision Notice and Finding of No Significant Impact and Forest Plan Amendment No. 31 (June 2, 1995)(Def's Exh. 105).

f. Strawberry Mountain—Monument Rock Fire Management Areas, Prescribed Natural Fire Program (Background and Fire Management Action Plan)("FMAP"—particularly pp. 46.1–46.1–36), July 1995 (Def's Exh. 106).

g. Portions of Chapter IV Forest Plan (Def's Exh. 107).

The text of the pertinent provisions of these various laws and documents is set forth at pages 7–13 of defendant's memorandum of law. Discrete portions of these documents are quoted and discussed below as necessary to explain my decision.

## C. *General Overview of Prescribed Natural Burn Policy*

This general overview is drawn from the United States General Accounting Office ("GAO") Report to the Chairman, Environment, Energy, and Natural Resources Subcommittee, Committee on Government Operations, "Federal Fire Management— Limited Progress in Restarting the Prescribed Fire Program," December 1990 (Def's Exh. 101).

For almost a century, the federal government's policy generally was to suppress all fires on federal lands. Eventually, however, experts began to understand that fire is essential to maintaining forest and wildland health. From the 1950s to the early 70s, National Park Service managers experimented with prescribed fire programs, which allow fire to play out its natural role in parks and wildernesses. By 1972, both the National Park Service and the Forest Service had formally adopted the policy of using fire as a tool to achieve land management objectives.

Before 1988, about 3500 fires were permitted to burn in parks and wildernesses. Most were small and aroused no controversy or concern. In 1988, however, a number of prescribed natural fires in Yellowstone National Park burned out of control, resulting in a controversy over what the media referred to as the government's "let burn" policy. Ultimately, the fires in Yellowstone, which were declared wildfires, burned about 700,000 acres and cost the government approximately $100 million in firefighting expenses. Because of the controversy, the government suspended the prescribed natural fire program.

In September 1988, the Secretaries of the Interior and Agriculture appointed a Review Team to review and identify problems in the program. The Review Team recommended that no prescribed natural fires be allowed to burn in a park or wilderness until approval of the unit's fire management plan. The team also established a goal of having improved individual park and wilderness fire management plans in effect by May 1989. As of August 1990, however, the Forest Service had approved fire management plans for only eight of 75 wildernesses, or 11 percent.

Specific to the Malheur National Forest, the Forest Service was concerned that the years of fire exclusion and suppression, resulting changes in forest vigor, and interactions between drought, low-vigor forests, and insect and diseases may have created fuel accumulations outside the range of any historically known conditions, permitting wildfires to become unnaturally intense and difficult to control. According to the Environmental Assessment prepared for the Malheur National Forest,

> There is a need to reduce the risk of danger to resources outside the wilderness.

Because of this, the purpose of and need for the proposed action is to:

> a. Meet the requirements of the Wilderness Act by allowing, as nearly as possible, for natural processes to occur unimpeded. In this case, allowing for the natural process of fire to operate within fire adapted ecosystems,
>
> b. Implement direction in the Forest Plan which affirmed the use of prescribed natural fire in wilderness * * *,
>
> c. Comply with the recommendations of the [GAO] * * * to move forward with the use of prescribed natural fire in wilderness management, and
>
> d. Provide for protection of private property and resources outside of wilderness from wildfires.

Def's Exh. 104, p. 1–2.

The Environmental Assessment ("EA")(Def's Exh. 104) proposed the use of

"prescribed natural fire in wilderness to restore and maintain a more natural fire regime per fire series * * *." Def's Exh. 104, p. 1–20. With respect to fuel accumulations, the Proposed Action section of the EA states:

> As part of the proposed action, unnatural fuel accumulations (amount and continuity) inside of wilderness as well as outside of wilderness would be reduced using management ignited prescribed fires so that prescribed natural fires may be managed in the future with minimal risk to other values. Management ignited prescribed fires to reduce unnatural fuels are acceptable throughout the wildernesses to facilitate the prescribed natural fire program, after site specific analysis is conducted. Areas targeted for priority treatment would be ponderosa pine, Douglas-fir, and grand fir series. However, other forest series may have management ignited prescribed fires proposed on a case by case basis.

*Id.*, p. 1–20. The EA Proposed Action, *i.e.*, the adoption of a prescribed natural fire program in the Malheur National Forest, was adopted in June 1995, and became Amendment No. 31 to the Malheur Forest Plan (Def's Exh. 105). The Strawberry Mountain—Monument Rock Fire Management Areas—Prescribed Natural Fire Program, dated July 1995 (Def's Exh. 106), is the document that implements the Forest Plan Amendment. Plaintiff's claims in this case primarily focus on aspects of this document, consequently, portions of the program are discussed below.

## D. *Terminology*

The following definitions are relevant to this decision:

*Prescribed fire:* is defined as any fire burning in a predetermined area, under predetermined environmental conditions and behaving in a predetermined manner to accomplish established management objectives. There are two types of prescribed fires:

1. *Natural Fires:* Those started by natural causes; for example lightening. These are referred to as prescribed natural fires (PNF).

2. *Management Ignited Fires:* Those ignited by qualified Forest Service officers. These are referred to as management ignited prescribed fires.

*Wildfire:* is defined as any fire not meeting a prescribed fire definition. A wildfire can be from a natural ignition (lightening) or human ignition.

Def's Exh. 104, p. 1–1.

The Wildcat fire at issue in this case began as a lightening strike, was managed as a PNF, and ultimately was declared a wildfire. No management ignited prescribed fire occurred.

## E. *The Conduct at Issue*

In his amended complaint, plaintiff alleges that defendant "was negligent and violated its own mandatory rules, regulations, policies or guidelines" in the following particulars:

a. Making the decision to allow lightening fires outside the designated area to be declared a PNF;

b. Failing to follow prescribed procedures by either not utilizing all of the prescribed risk assessment criteria in its decision-making process, or failing to implement appropriate control or suppression activities when it was determined, or should have been determined, that the fire exceeded, or was anticipated to exceed, one or more prescription parameters and/or holding capability with the budgeted project funds;

c. Failing to have in place sufficient budget, management resources or con-

tingency plans to prevent damage to private property;

　d.　Ignoring or negligently misreading data regarding expected fire behavior and allowing the fire to continue to burn;

　e.　Failing to follow appropriate mandated suppression activities when the fire was declared, or should have been declared, a wildfire;

　f.　Canceling suppression efforts [plaintiff] ordered to prevent or suppress fires upon the Oxbow Ranch.

Amended Complaint, ¶ 11.

### F.　*Analysis of Nature of Conduct at Issue*

As explained above, the first step in discretionary function analysis is to determine if any specific, mandatory statute, regulation, or policy required defendant to do or to not do something as plaintiff has alleged. This requires a step-by-step analysis of the particular actions challenged. In his response to defendant's motion, plaintiff challenges the following actions:

### 1.　Approval of the Wildcat PNF.

■　Plaintiff contends that defendant could not declare the Wildcat fire a PNF because, according to him, the fire originated "outside the area approved for PNF implementation." Plaintiff's Response, p. 3, 24. Defendant responds that plaintiff misconstrues the FMAP (Def's Exh. 106), and in particular, misreads Figures 8A and B, which are included in the FMAP at p. 46.1–2. The text that accompanies Figures 8A and B (as well as text throughout the FMAP) is, as defendant states, "all inclusive" in that all of the Strawberry Mountain Wilderness is included in the PNF implementation area. *See, e.g.,* FMAP, p. 46.1–1, which states:

> PNF Implementation areas addressed by this section of the Malheur Fire Management Action Plan include the Strawberry Mountain and Monument Rock

Wildernesses, and adjacent non-wilderness lands * * *.

*See also* Def's Exh. 106, p. 3, which, referring to the Strawberry Mountain and Monument Rock Wildernesses, states "[n]atural ignitions (lightening fires) are considered prescribed natural fires unless they fail to meet predetermined conditions."

The evidence of record establishes that the Wildcat PNF was within the PNF implementation area. Plaintiff's allegation to the contrary simply is erroneous.

### 2.　*Failure to Reduce Fuel Before Declaring PNF*

■　Plaintiff contends that defendant was mandated to reduce fuel in the area where the fire occurred before declaring a PNF. Plaintiff finds support for this argument in various policy statements and in the FMAP identification of "[p]robable areas of concern." (Def's Exh. 106, p. 46.1–35–36 and Figures 16 A and B). However, plaintiff has identified no mandatory, specific statute, regulation, or policy that required defendant to reduce fuels in the area before declaring a PNF. To the contrary, the documents are phrased in discretionary language. For example, the FMAP section entitled "Fuel Treatment to Reduce Hazard" provides:

> Human-initiated fuel treatment measures *may* be necessary either inside or outside the wilderness to reduce fuel hazard and facilitate implementation of the PNF Program.

> 　　　* * *

> Fuel treatments that *may* be used to accomplish these objectives include:

> 　　　* * *

> Each ignition will need to be assessed on a case by case basis—* * * however information provided by a recently de-

veloped decision-support tool (RERAP computer program) *indicates* that a majority of ignitions that originate within two miles of the wilderness boundary, [especially] early or midway through the fire season, have a high probability of escaping * * *. This situation *suggests* that a two mile area within the wilderness is *a candidate area for future human-initiated fuel treatment measures* to facilitate the PNF Program and lessen probability of escape. A more site specific evaluation of fuel characteristics, topography and potential fire behavior along the wilderness perimeter or within the wilderness *will be necessary to determine which treatments and establishing priorities.*

Def's Exh. 106, p. 46.1–35 (emphasis added). The FMAP assigns responsibility to the three District Rangers to "identify, prioritize, and schedule *appropriate* treatments, both inside and outside the wilderness * * *." *Id.,* pp. 46.1–35–36 (emphasis added).

Thus, while fuel treatment is to be considered, there is no mandatory directive that fuel must be reduced before a PNF is declared, as plaintiff suggests.

### 3. *PNF Size/Funding Issues*

■ Plaintiff next contends that mandatory standards required defendant to declare the Wildcat PNF a "wildfire" and begin suppression efforts on August 7, 1996, because it "exceeded prescription" on that date. As a corollary to that argument, he contends that the fire could not be maintained within the prescription with project funds, requiring defendant to declare a wildfire. Plaintiff finds support for this argument in the following language, which he claims can be found in FSM (Forest Service Manual) at section 5140.3–1:

if a prescribed fire exceeds, or is anticipated to exceed, one or more of the prescription parameters and/or holding capacity, cannot be maintained within the prescription with project funds, it must be declared a wild fire.

Plaintiff's Response, p. 27. The above quotation does not appear in any document of record. The FSM is included in the record as Def's Exh. 102, but the provisions of section 5140.3 are missing. According to defendant, section 5140.3 (Policy) provides direction as follows:

5. In the Burn Plan address appropriate actions to take if onsite conditions change and cause one or more prescription parameters to exceed acceptable limits. A prescribed fire that exceeds, or is anticipated to exceed, one or more prescription parameters and/or holding capability, and cannot be maintained within prescription with project funds is a wildfire. Once an escaped prescribed fire has been declared a wildfire, it cannot be redesignated as a prescribed fire. Take appropriate suppression action in accordance with FSM 5130.

Defendant's Reply Memorandum, pp. 6–7. Plaintiff does not dispute this language.

The question, then, is whether the fire exceeded some mandatory "prescription parameters" or could not be maintained within prescription with some mandatory level of project funds. Defendant points out that the FMAP requires neither specific prescription parameters or funding levels. *See* Def's Exh. 106, p. 46.1–24. FSM 5142.23 establishes the requirements of a burn plan ("RxBP"), and provides, in pertinent part, as follows:

2. Fire projections, using both "expected" and "most severe" weather scenarios.

3. Identification of Maximum Allowable Perimeter (MAP).

\* \* \*

7. Cost estimates to manage the fire.

8. A risk assessment that estimates the probabilities and consequences of success and failure to the approving official. As [sic] a minimum, consider threat to life or property; smoke management concerns and the threat of violating smoke management requirements; resource availability for current and anticipated needs; * * * fire intensity, location and extent, and prediction to remain within the maximum allowable perimeter * * *.

9. Monitoring actions to ensure accurate and timely information on fire behavior, location, and so forth.

10. Holding actions necessary to keep the fire within prescription.

11. Contingency actions to take if the fire exceeds prescription parameters and/or holding capabilities and cannot be maintained within prescription with project funds.

* * *

13. Identification of decision criteria for daily revalidation, ensuring that the fire will remain within prescription for the ensuing 24-hour periods, given reasonably foreseeable weather conditions and expected fire behavior.

14. Provisions for daily revalidation of criteria.

Def's Exh. 102, pp. 8–9 (FSM 5142.23).

The Wildcat PNF burn plans, Def's Exhs. 112, 120 and 121, contained this information. There are three burn plans because each time defendant determined that an additional lightening-caused fire (called an "incident") was appropriate for inclusion in the PNF, defendant revised the burn plan.

As the court understands plaintiff's argument, as of August 7, 1996, the Wildcat PNF had exceeded the RxBP maximum daily growth prediction of 15 acres per day. *See* Plaintiff's Response, p. 27–28. The key word here, however, is "predic-

tion." Plaintiff points to no specific, mandatory, statute, regulation or policy that requires a PNF to be declared a wildfire if it exceeds the predicted daily growth.

Plaintiff also appears to contend that defendant had only sufficient funding in place ($20,000) to manage fires of the final size predicted in scenarios 1 (1090 acres) and 2 (1225 acres) of the RxBP, but not scenario 3, which called for a maximum size of 4800 acres and a suppression cost of $56,200. *See* Def's Exh. 121 (last page—decision tree). But plaintiff's own argument recognizes that as of August 7, 1996, the fire only had grown to 900 acres, or smaller than the final size predicted in any of the three scenarios. Plaintiff's Response, pp. 27–28. Moreover, he has not identified any specific, mandatory statute, regulation, or policy that required defendant to declare a PNF a "wildfire" if it had not secured funding for the worst case scenario, especially where even the worst case scenario remained within the MMA (maximum manageable area) of 13,200 acres specified in the RxBP.

Plaintiff's real theory seems to be that defendant was negligent in its predictions, its preparation of the initial RxBP and the amendments, and its calculations of funding requirements, but as explained above, negligence is irrelevant to discretionary function analysis. And although, as noted above, plaintiff made other allegations in his amended complaint, he did not address them in his arguments and, in any event, they sound in negligence and do not allege violation of some specific, mandatory standard.

In summary, defendant has carried its burden of establishing that the conduct plaintiff challenges in this action did not violate any specific, mandatory directive and was discretionary. Consequently, defendant is immune from liability under 28 U.S.C. § 2680(a), and this case must be

dismissed for lack of subject matter jurisdiction.

## CONCLUSION

Defendant's motion for summary judgment (#16) as to the issue of liability is GRANTED. Defendant's alternative motion to dismiss and any other pending motions are denied as moot, and this action is dismissed.